## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| JAKE PAUL HEINEY, | CASE NO. 3:21-CV-00501 |
| Petitioner, |  |
| vs. | DISTRICT JUDGE DAN AARON POLSTER |
| DONNA MOORE, Director, Lucas County Adult Probation Department; *et al.* | MAGISTRATE JUDGE AMANDA M. KNAPP |
| Respondent. | **REPORT AND RECOMMENDATION** |

Petitioner Jake Paul Heiney ("Petitioner") brings this habeas corpus petition pursuant to 28 U.S.C. § 2254.  (ECF Doc. 17 ("Petition").)  He filed the Petition at issue on June 4, 2021. (*Id.*)  His Petition relates to his convictions for two counts of gross sexual imposition and one count of tampering with records, in Lucas County Court of Common Pleas Case No. CR0201502287, following a jury trial.  (ECF Doc. 17; ECF Doc. 40-1.)  Respondent filed an Answer/Return of Writ (ECF Doc. 20), Petitioner filed a Traverse (ECF Doc. 22), and Respondent filed a Reply to Petitioner's Traverse (ECF Doc. 35).  The case is briefed and ripe for decision.

The matter was reassigned to the undersigned Magistrate Judge on October 1, 2021, pursuant to General Order 2021-15.  For the reasons set forth in detail herein, the undersigned recommends that the Court: (1) **DENY** Ground One; (2) **DISMISS** and/or **DENY** Ground Two; (3) **DISMISS** Ground Three; and (4) **DISMISS** Ground Four.

1

## I.      Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.[1]  *See id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Sixth District Court of Appeals of Ohio summarized the facts underlying Petitioner's conviction and sentence as follows:

{¶ 2} Heiney is an orthopedic surgeon who ran his own medical practice, called Cutting Edge Orthopedics. He operated two offices, one in Sylvania, Ohio, and the other in Lambertville, Michigan. In this case, Heiney is alleged to have touched two female patients inappropriately while examining them at his Sylvania office in early 2015. The patients, referred to as "M.S." and "K.O.," offered the following testimony at trial.
M.S.

{¶ 3} M.S., a 42-year-old woman, first treated with Heiney in 2010. In 2014, she returned to Heiney with complaints of left shoulder pain and weakness. M.S. treated with Heiney a total of four times for left shoulder pain. The pain was localized to her left shoulder; it did not radiate to her chest, breast area, or any other area. The first two appointments were uneventful.

{¶ 4} M.S.'s third appointment occurred on January 8, 2015. Heiney examined M.S. with the door closed but unlocked; no one else was in the room at the time. M.S. was wearing a tank top with thin straps and a bra, and she was seated at the exam table. Heiney asked if he could pull the straps down so that he could examine her shoulder, and M.S. said, "Okay." While preparing to give M.S. an injection, Heiney explained that he would put gauze inside her bra because he "didn't [want to] get anything on [her] pretty pink bra." M.S. "tried to ignore" and "blow off" the comment, although it "felt weird." According to M.S., Heiney then "pulled out the cup of my bra and he * * * tucked [the gauze] like all the way underneath my breast,

---

[1] While Petitioner's Traverse provides a summary of trial testimony and seeks to expand the record to support his arguments to excuse procedural default (ECF Doc. 22, pp. 17-41), Petitioner does not offer any developed argument rebutting the presumption—by clear and convincing evidence—that the state court factual findings are correct.  The undersigned therefore finds any intended argument challenging the state court factual findings has been waived. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (finding "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

and the back of his hand was brushing my breast as he kept tucking [the gauze] down." Heiney gave M.S. the injection.

{¶ 5} According to the indictment, the alleged criminal conduct occurred during M.S.'s fourth and final appointment on February 12, 2015. M.S. complained of "progressively * * * worse" shoulder pain, although still localized to the shoulder. During the exam, M.S. sat upright on the exam table. She testified that Heiney "asked if it was okay * * * to take my arm out of my shirt this time." At the last appointment, Heiney had only sought permission to lower the straps of her bra and tank top. M.S. said, "okay" because, as she explained, "I was having so much pain, and I couldn't do my job. I just wanted to feel better." Heiney helped M.S. pull her arm out of her shirt, and then examined her left bicep by placing pressure on her arm with his hands. M.S. experienced discomfort to her bicep because he "press[ed] so hard for so long." Heiney told her that pain from her breast can radiate to the arm, and he asked to perform a "breast exam," to which she agreed. According to M.S., Heiney pulled the cup of her bra down, which completely exposed her breast. He "pushed on my breast all over the top and underneath and then he squeezed it between his fingers, and he pushed on it some more." While examining her breast, Heiney asked if it hurt, and M.S. said "no." She testified, "I didn't have any pain * * * because [my breast] wasn't hurting me to begin with." M.S. felt "uncomfortable" and "pretend[ed to be] somewhere else."

{¶ 6} Heiney then examined her neck, and they discussed the fact that M.S. was also experiencing headaches. Next, Heiney asked to examine M.S.'s breast again, which he did by "push[ing] on it a couple times." He then prepared to give M.S. an injection in her arm. Heiney, again, pulled the cup of her bra away from her body, and placed a piece of gauze "deep inside the bra under [her] breast." He also commented that "women always [wear] white bras to the doctor." No one was in the office at the time, and M.S. does not recall that Heiney wore gloves during his examination of her.

{¶ 7} After her appointment, M.S. felt "embarrassed * * * angry [and] ashamed." She did not return for further treatment. Two weeks later, M.S. requested and received her medical chart from Heiney's office.

{¶ 8} M.S. then sought treatment from Dr. Christopher Foetisch, also an orthopedic surgeon, who told her that her shoulder was dislocating and needed surgery. They also discussed how Dr. Foetisch conducts physical exams, and based on that conversation as well as her own feelings, M.S. concluded that Heiney's conduct had been improper.

{¶ 9} M.S. filed a complaint against Heiney with the State Medical Board of Ohio ("SMBO") on April 1, 2015. In it, M.S. complained of "sexual misconduct" and "inappropriate" conduct by Heiney during the January 8, 2015 and February 12, 2015 appointments. Under cross-examination, M.S. denied that Heiney made any

3

inappropriate comments to her, and she did not think that Heiney had an erection during his examination of her.

K.O.

{¶ 10} K.O., a 33-year-old woman, treated with Heiney on one occasion, March 12, 2015. She complained of left-sided pain in her shoulder, low back, and hip. K.O. reported that the pain radiated down her left arm, into her hand and "occasionally" into her buttock, all the way down her leg into her knee. K.O. met with Heiney in an exam room. No one else was present. During the first part of the exam, Heiney manipulated her left arm in different positions, asking if the movements caused any pain. As described by

K.O.:
And then he * * * asked me if I was experiencing any discharge from my breast, and I said no. So he told me to take * * * my arm out of my sleeve and my bra strap as well, and then he held my arm like this with his one hand and with the other hand he pulled my bra down, and then gave me a breast exam and asked me if I had any pain, which I said no. And then he held my arm in a different positon and then gave me a second breast exam, the whole time when my bra had been down at this point, and then he pulled my bra back up and held my arm in a couple different positons asking me, * * * ["]does this hurt, does this hurt["] and feeling around in my arm. And then * * * a third time he pulled my bra down again, said ["]one more time["], and gave me a third breast exam.

{¶ 11} K.O. described his palpation of her breast as "padding of his fingers and just going around," but during his third examination, he "cupped" her breast.

{¶ 12} K.O. momentarily left the exam room so that an x-ray could be taken of her neck. When she returned, Heiney examined her low back. K.O. described the examination:

I was facing him and he was feeling a little bit [of] my hip * * * and asking me what hurt and where. And then he asked me to turn around and face the table and touch my toes, so I did. At that point he grabbed my pants and my underwear and pulled them down to right above my knees, and then started to feel around on my behind and on my side and in my upper thigh region where his fingers kind of brushed against my private area.

{¶ 13} When asked to elaborate, K.O. testified that while he was "grabbing the inner part of the thigh and the lower part of the butt" with his hand, Heiney's fingers brushed up against her genitalia. K.O. said that she was "extremely" surprised when Heiney pulled down her pants and that he gave her no warning that he was going to do so, nor did he give her any explanation as to why it was necessary. With K.O. still bent over, Heiney asked her if she could bend over any farther. When she said that she could not, he stopped touching her, and K.O. "grabbed my pants and stood

4

up quick to pull them up." Heiney announced, "well, I'm done." K.O. testified that Heiney was not wearing gloves.

{¶ 14} After the appointment, K.O. prepared a typed-written statement of what had occurred. K.O. did not mention that Heiney had brushed his hand by her vaginal area or "cupped" her breast because, she testified, she did not know how detailed the statement should be and because she was "extremely" embarrassed. Two days after the incident, K.O. reported Heiney's conduct to the Toledo Police, which redirected her to the Sylvania Police Department because the incident occurred in Sylvania. On March 15, 2015, now three days after her appointment, K.O. met with the Sylvania Police and signed the statement.

The Investigation

{¶ 15} K.O.'s case was assigned to Sylvania Police Detective Laura Bliss. As part of her investigation, Detective Bliss contacted Investigator Amy Myers with the SMBO. Although there were no other complaints pending with the SMBO at that time, M.S. filed her complaint with the SMBO shortly thereafter, on April 15, 2015. Investigator Myers then contacted Detective Bliss and notified her of M.S.'s complaint against Heiney, and the two coordinated their respective investigations going forward.

{¶ 16} Detective Bliss and Investigator Myers jointly interviewed K.O. and recorded the conversation. K.O. told them that Heiney's fingers actually rubbed against her genitals when he examined her low back. At Bliss's suggestion, K.O. requested a copy of her medical records from Heiney's office.

{¶ 17} Detective Bliss conducted a videotaped interview of Heiney at the police station on May 6, 2015 regarding K.O.'s complaint. Heiney's records indicate that, within hours of his police interview, Heiney viewed and printed K.O.'s electronic medical record ("E.M.R."). The next day, Heiney asked one of his medical assistants, Jennifer Downard, to make an "add-on" to the E.M.R. by adding some of his handwritten notes. Heiney stated that he made the changes "to make sure [the E.M.R.] was as correct as it could be." He denied adding "blocks of information" but claimed that he just made minor additions to it.

{¶ 18} Investigator Myers also interviewed Heiney about K.O.'s allegations, which occurred on June 8, 2015.1 Heiney was unaware that his interviews with Bliss and Myers regarding K.O. were recorded. Both interviews were played for the jury, and an overall summary of Heiney's recorded statements is set forth below:

{¶ 19} Heiney stated that he "always" wears gloves while performing examinations, unless he is examining for infection. He also claimed that he "always" asks permission before touching a patient's sensitive areas. Heiney stated that it is his practice to have a third person present when examining a patient. He is, however, occasionally unaccompanied if his medical staff is occupied with other

patients. It is "highly unlikely" that he would see a new patient, like K.O., without having another individual in the room.

{¶ 20} Heiney stated that he does not perform "breast" exams but may examine a patient's chest if the patient is experiencing breast discharge or complaining of pain that radiates to, or from, the breast. If the latter, he would palpate the breast to try and reproduce the pain, and he would also compare one breast to the other. If Heiney palpated a breast, it should be noted in a medical record, although it might only state that shoulder pain "radiates." He said that a breast discharge would definitely be noted. During such an exam, there is no need to touch a patient's nipple, unless the patient complains of "mastitis," which is inflammation of the mammary gland.

{¶ 21} When giving a shoulder injection, Heiney stated that his practice is to place gauze above the chest area to catch any fluids; he said that he would not place gauze in the cup of the bra or under the breast.

{¶ 22} Heiney could not specifically recall K.O., but in anticipation of his interview with Investigator Myers, Heiney reviewed her medical records. Based on that review, Heiney said that K.O. complained of low back pain and shoulder pain that was radiating to her upper arm, neck and chest.

{¶ 23} He said that if he did a chest exam on K.O., it was likely because she was complaining of pain in her pectoral muscles, which are above the chest. If she complained of low back and leg pain, it would be normal to ask her to bend over and touch her toes. He would also palpate the sacroiliac joint ("SI joint"), which is located in the middle of the buttock area, on either side of the tailbone. To palpate the SI joint, a patient could be seated or standing. The purpose of palpating is, in part, to try and reproduce the pain and also to feel for deformities of the spine.

{¶ 24} Heiney said that because K.O. was a new patient and because she had many areas of pain, it is likely that she would have changed into a gown before he examined her. Assuming that K.O. was in a gown, she would have had her underwear on. As part of his examination of her low back, he would likely have asked her to bend down and touch her toes, and because of the location of her pain (i.e. the S.I. joint), he would have pulled her underwear down just enough that the upper part of her buttocks would have been exposed. According to Heiney, the only reason to completely expose a patient's full buttock is if the patient complained of buttock, as opposed to low back, pain.

{¶ 25} Heiney denied that he has ever inappropriately touched a patient or been accused of doing so. Although he did not recall his examination of K.O., he denied performing an unnecessary breast exam on her because he would not deviate from appropriate conduct. Heiney characterized allegations of inappropriate conduct as "crazy." He added "I don't do anything that they don't say is okay."

6

{¶ 26} As part of the state's criminal investigation, Detective Bliss conducted a number of interviews, including Heiney's orthotist, Brian Kinsella and Heiney's two nurses. Bliss also interviewed office staff at Heiney's Sylvania office regarding record keeping practices, and she interviewed ten health care professionals to learn about standard exam procedures.

{¶ 27} Heiney's long-time orthotist, Brian Kinsella, also testified at trial. According to Kinsella, when Heiney examined a patient, Kinsella or one of Heiney's nurses, would "usually" be in the room. In the eight years that Kinsella worked with Heiney, Kinsella never saw Heiney place gauze underneath a female patient's breast. According to Kinsella, Heiney "always" wore gloves when performing an exam. As for low back exams, Kinsella testified that Heiney would ask a patient for permission to lower a patient's underwear, and he would only lower it "slightly," just enough to expose the SI joint. Kinsella never saw Heiney lower a female patient's pants to her knees.

Michigan Patients

{¶ 28} The state offered the testimony of three female patients who treated with Heiney in his Michigan office—"C.G.," "L.G.," and "S.E."—under Evid. R. 404(B).

{¶ 29} C.G. saw Heiney for pain in her lower back and right leg, numbness in her leg, and stiffness in her neck. C.G. claimed that Heiney unnecessarily touched her breasts on April 14, 2015 in his office:

[Heiney said,] ["]does it hurt here, show me where it hurts, does it hurt when you do this[?"] And then at one point during this process, he looked at me, grabbed the gown and the bra at the same time, pulled the strap down with his hand in this fashion, squeezed, put the * * * gown back up, walked around to the other side and repeated that exact same process * * *. [He said,] "now you don't have any pain here, no pain here[?] Okay.["] Bra and gown pulled to the side, reached and grabbed, and back up. * * * [He grabbed] "my whole breast tissue" in a "squeezing cupped fashion."

{¶ 30} S.E. sought treatment from Heiney for right shoulder pain. On April 21, 2015, Heiney entered the examination room to find S.E. still clothed. Heiney said that he was in a hurry and to "take off her top" so that she could receive an injection. Heiney offered to help S.E. take off her top, which she declined, and then watched her disrobe instead of leaving the room while she changed. Once she had a gown on, Heiney helped S.E. to remove her bra in preparation for an injection. S.E. testified that Heiney examined both her breasts. As described by her, Heiney "poked" at her right breast and then "reached around and cupped" her left breast that included making "some type of movement" with her nipple. S.E. wondered "why is he doing this * * * first just poking it, there's no value to that, and then reaching around [to her] unaffected side."

{¶ 31} L.G. treated with Heiney a total of four times between late March and April of 2014. The first appointment was unremarkable. During her second appointment, L.G. complained of tightness in her low back. L.G. said that Heiney asked her to touch her toes while standing behind her, and without warning, he "pulled my pants and my underwear down to right above my knee and with his thumbs palpated the muscles above my hip parallel to my spine." After L.G. pulled up her pants *1047 and turned around, she observed that Heiney had an erection. The third appointment was unremarkable, but during the fourth and final appointment, Heiney again pulled her pants and underwear down. This time, L.G. pulled her underwear back up and said, "they [her underwear] didn't need to be down."

{¶ 32} C.G., S.E., and L.G. all filed separate complaints against Heiney with the local Michigan police department, and the allegations went to trial. Some charges resulted in convictions after a bench trial, and the charges relating to L.G. resulted in a directed verdict. Although the trial court allowed C.G., S.E., and L.G. to be cross-examined with their sworn testimony from the Michigan case, the court did not allow either side to introduce evidence regarding the ultimate dispositions of the Michigan charges.

Defense Witness

{¶ 33} The defense called one witness, Dana LeFevers, who worked for Heiney as a medical assistant. LeFevers testified that either she, Kinsella, or another nurse were always in an examination room while Heiney was examining a patient and that he always wore gloves. LeFevers never witnessed Heiney do anything inappropriate with a patient. LeFevers testified that it was routine for Heiney to palpate a patient's pectoral muscles if that patient was complaining of shoulder or chest pain. She never saw him do any of the things he is accused of doing in this case, specifically: palpate a woman's breast tissue, cup a woman's breast, roll a woman's nipple with his fingers, place gauze underneath a woman's breast, or pull down a patient's underwear and pants.

Jury Verdict and Sentence

{¶ 34} The jury found Heiney guilty of two counts of Gross Sexual Imposition ("GSI"), in violation of R.C. 2907.05(A)(1) and (C), felonies of the fourth degree (Counts 1 and 2) and one count of Tampering with Records, in violation of R.C. 2913.42(A)(1) and (B)(1)(2)(a), a misdemeanor of the first degree (Count 3).

{¶ 35} The trial court sentenced Heiney to 180 days in the county jail and fined him $1,000 as to Count 3. With regard to Counts 1 and 2, the court sentenced Heiney to serve 90 days at the Department of Work Release and four years of community control. It also fined Heiney $2,000 as to Count 1 and an additional $2,000 as to Count 2 and ordered him to register as a Tier I sex offender pursuant to R.C. Chapter 2950. Heiney requested, and was granted, a stay of execution of his sentence, pending his appeal. Through his appellate counsel, he raises 11 assignments of error for our review.

*State v. Heiney*, 2018-Ohio-3408, ¶¶ 2-35, 117 N.E.3d 1034, 1042-48 (Ohio Ct. App. 2018).

## II.     Procedural Background

### A.     State Court Conviction

On August 7, 2015, Petitioner was indicted on two charges of gross sexual imposition in violation of Ohio Revised Code 2907.05(A)(1) and (C), felonies in the fourth degree, and a charge of tampering with records in violation of Ohio Revised Code 2913.42(A)(1) and (B)(1)(2)(a), a misdemeanor of the first degree.  (ECF Doc. 40-2.)  After a jury trial which commenced on February 17, 2016, Petitioner was convicted on all counts.  (ECF Doc. 40-1.)  The trial court sentenced Petitioner to serve 180 days in jail, 90 days in the county work release program, fined him $5,000 and designated him a Tier 1 sex offender.  (*Id.*)

### B.     Direct Appeal

Petitioner appealed to the Court of Appeals, Sixth District, Lucas County, and raised the following eleven assignments of error:

> Error I: The convictions for Gross Sexual Imposition are not supported by sufficient evidence. As such, Heiney's federal and state constitutional rights to due process of law have been violated and the trial court erred by not granting his Crim.R. 29(A) motion for judgment of acquittal.
>
> Error II: The convictions for Gross Sexual Imposition are against the manifest weight of the evidence.
>
> Error III: The trial court's decision to allow an audiotape to be played which contained no statements against interest or contradictory statements, but which included a non-testifying witness expressing his opinion that Heiney was a liar violated Heiney's right to a fair trial.
>
> Error IV: The conviction for Tampering with Records is not supported by sufficient evidence and as such the trial court erred by not granting this Crim.R. 29(A) motion for judgment of acquittal.
>
> Error V: The conviction for Tampering with Records is against the manifest weight of the evidence.

Error VI: The trial court erred when, after finding the state failed to comply with Crim.R. 16(K) failed to impose stringent enough sanctions and then allowed the state to violate the sanctions. The trial court also violated Heiney's right to cross-examine witnesses against him.

Error VII: The trial court erred regarding the Evid.R. 404(B) evidence because it did not make the necessary findings for its admission, it was cumulative, and it was more prejudicial than probative. Further, the trial court erred by not giving curative instructions and wrongfully prohibited Heiney's right to cross-examination.

Error VIII: The trial court denied Heiney the right to a fair trial through a series of erroneous evidentiary rulings.

Error IX: The mandatory tier requirement imposed on Heiney is unconstitutional as cruel and unusual punishment.

Error X: The trial court denied Heiney a fair trial when it permitted a police detective to testify as an expert witness, to hearsay and by permitting her to vouch as to the truthfulness of the two complainants.

Error XI: The trial court's jury instructions, particularly as to the intent necessary to prove Gross Sexual Imposition and what constitutes force, were wrong in that they contradicted the clear statutory language and case law.

*Heiney*, 117 N.E.3d at 1047-48.

On August 24, 2018, the state court of appeals overruled his eleven assignments of error and affirmed the judgment. *Heiney*, 117 N.E.3d at 1048-74. The court of appeals held that: the evidence was sufficient to support his convictions; the convictions were not against the manifest weight of the evidence; the trial court did not abuse its discretion in refusing to limit testimony from one of Petitioner's patients who was not a defendant in the trial but who testified to having a similar experience with Petitioner; an expert witness did not testify beyond the scope of his written report; the trial court's error in jury instructions regarding psychological pressure and force was harmless; and the Petitioner's Tier I sex offender classification did not constitute cruel and unusual punishment under the United States Constitution. (*Id.*)

Petitioner timely appealed to the Ohio Supreme Court through new appellate counsel on September 20, 2018.  (ECF Doc. 40-22.)  In his memorandum in support of jurisdiction, he raised the following questions:

A. Substantial Constitutional Questions

1. Is Due Process under the Ohio and United States Constitutions, which both require that the government prove every element of a charged offense, and prohibits vague offenses, violated when statutes are broadly construed against the accused rather than strictly construed against the State as required by the Rule of Lenity memorialized by the Ohio General Assembly in R.C. 2901.04?

2. May it be "harmless error" when Defendant's right to a fair trial before an impartial jury and due process of law under the Ohio and United States Constitutions is violated when a faulty jury instruction, which abrogates one of the elements of the crime that the State must prove beyond a reasonable doubt, is presented to the Jury?

B. Questions of Public or Great General Interest

1. Is it possible to define the word "alter," in the context of "Tampering with Records" under the rules of construction required for a criminal statute, in such a way that it criminalizes date-stamped additions to an electronic database, similar to those widely used in many industries to prevent fraud, where the original record remains pristine, is still available and no fraud has occurred?

2. When the State fails to provide the accused with proper notification of expert testimony, is the exclusion of expert testimony under Ohio R. of Crim. Pro. 16(K), in fact, mandatory as the rule states?

(*Id.*)  In support of the above, Petitioner raised the following propositions of law:

Proposition of Law I: The term "alter" as used in the "Tampering with Records" statute is defined as this Court has defined it going back to the Civil War: an alteration requires a change to an original record such that the original no longer exists, and cannot be construed to include a date stamped addition to an electronic file where the original record has *not* been changed in any way.

Proposition of Law II: The Ohio Supreme Court amended the Ohio Rules of Criminal Procedure as they apply to criminal discovery in 2010, to ensure fair trials and address a crisis of confidence in Ohio criminal courts, as such, the State must strictly adhere to the requirements of Crim. Rule 16(K) and the exclusion of testimony for the failure by the State to file an expert report is mandatory.

11

Proposition of Law III: In Ohio, the use of "force" as used in the "Gross Sexual Imposition" statute is defined by R.C. 2901.01(A)(1) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing" and cannot be construed, under the Rule of Lenity memorialized in R.C. 2901.04, to include the simple moving of a patient's clothing during a medical exam, or the closing of a door during medical exam and such a construction would render the statute unconstitutionally void for vagueness and so be an invalid construction.

Proposition of Law IV: Due Process of law requires that the State prove every element of an alleged crime: sexual gratification is a required element of both "Sexual Imposition" and "Gross Sexual Imposition" and may not be inferred by a Jury based upon a Medical Professional or First Responder's touching of any part of the body alone, some evidence of actual intent of gratification must be produced

Proposition of Law V: An improper Jury Instruction which allows a Jury to find guilt beyond a reasonable doubt without finding all of the material elements beyond a reasonable doubt is a fundamental denial of the Defendant's rights to Due Process of Law and a fair trial under the Ohio and United States Constitutions: when an instruction presents easier met definition of a fact that must be proven there is no alternative but reversal because the Court may not enter a directed verdict of guilty, and or the improper definition amounts to structural error[.]

(ECF Doc. 40-24, pp. 2-3.)   The Supreme Court of Ohio declined to accept jurisdiction on December 26, 2018.  (ECF Doc. 40-25); *State v. Heiney*, 154 Ohio St.3d 1464 (2018).  Petitioner filed a motion for reconsideration, which was denied on March 6, 2019.  (ECF Docs. 40-27, 40-28).  Petitioner filed a petition for a writ of certiorari with the United States Supreme Court, which was denied on October 7, 2019.  (ECF Doc. 40-30); *Heiney v. Ohio*, 140 S.Ct. 108 (2019).

**C.      Post-Conviction Relief**

Petitioner filed a Petition for Postconviction Relief on October 12, 2017.  (ECF Doc. 40-1, p. 16.)  Briefing was held in abeyance and the matter was stayed pending the resolution of the direct appeal.  (*Id.* at pp. 16-18.)  The matter was reactivated on September 14, 2018, following the August 24, 2018, affirmation of Petitioner's convictions by the state court of appeals.  (*Id.* at p. 19.)  Counsel for Petitioner and for the state stipulated that an amended petition would replace the original petition in its entirety and "nullify the prior Petition and the State's response."  (ECF

Doc 40-31.)  On December 14, 2018, Petitioner filed his First Amended the Petition for Post-conviction Relief, submitting affidavits and other documents in support.  (ECF Doc. 40-32.)

In the First Amended Petition for Post-conviction Relief, Petitioner presented two arguments, both related to ineffective assistance of counsel:

> Defendant was Denied Due Process and Effective Assistance of Counsel under the United States and Ohio Constitutions when Trial Counsel Failed to Seek Continuance to Consult with a Willing Expert.
>
> Defendant was Denied Due Process and Effective Assistance of Counsel under the United States and Ohio Constitutions when Trial Counsel Failed to Properly Investigate the Medical Criteria Applicable to Dr. Heiney's Conduct by not Consulting with Dr. Corn or Other Available Potential Experts, or the Materials Provided by Dr. Heiney.

(*Id.* at pp. 8-12.)  The post-conviction petition was denied by the trial court on May 1, 2019, which found Petitioner had failed to establish any basis for relief that was not barred by res judicata.  (ECF Doc. 40-35.)  Petitioner appealed to the Sixth District Court of Appeals (ECF Doc. 40-36), presenting the following assignment of error and issues for review:

I. Assignment of Error

1. It was contrary to law and an abuse of discretion for the trial court to deny Dr. Heiney's petition for postconviction relief without a hearing because competent, relevant, material evidence dehors the trial court record was presented which could not have been fairly been [sic] presented in any other proceeding and which established that Heiney had in fact been denied effective assistance of counsel under both the Ohio and federal constitutions. Appendix at A(a)1.

II. Issues presented for Review

1. When presenting an argument for Ineffective Assistance of Counsel based upon the failure of counsel to investigate the case before and during trial, and refusing to seek a continuance to consult an available expert, does the presentation of competent, relevant, and material evidence *de hors* the trial court record defeat the application of *res judicata* in post-conviction relief proceedings?  Yes.

2. May a defendant raise an assignment of error in a direct appeal based upon facts that do not appear in the trial record?  No.

13

(ECF Doc. 40-37, p. 5.)  The court of appeals denied the post-conviction appeal, albeit on

different grounds than the trial court, on May 1, 2020.  (ECF Doc. 40-39.)  The court explained:

> Although we disagree with that part of the trial court's judgment that found res
> judicata applicable, we find that the court's rejection of Heiney's ineffective
> assistance claim to be correct on other grounds. *See, e.g., Teets* at ¶ 41 (Noting that
> a reviewing court "will not reverse a correct judgment merely because it is based
> on an erroneous rationale").

(*Id.*); *State v. Heiney*, No. L-19-1115, 2020-Ohio-2761, ¶15, 2020 WL 2096398, at *6 (Ohio Ct.

App. May 1, 2020)  In particular, the court concluded

> Heiney failed to present sufficient, credible evidence demonstrating that he suffered
> a violation of his constitutional rights based on his trial counsel's failure to call a
> medical expert to testify at trial or to seek a continuance of the trial date. Therefore,
> Heiney's assignment of error is found not well-taken.

*Id.* at *8.

Petitioner did not file a timely petition for review of this denial with the Supreme Court

of Ohio.  (ECF Doc. 17, p. 10; ECF Doc. 20, p. 17)  In his federal habeas petition, he explained

the following regarding his failure to timely file his appeal with the Supreme Court of Ohio:

> Heiney filed the above memoranda in what he believed to be timely in [sic]
> compliance with various Coronavirus tolling orders, the court clerk refused to file
> the appeal, and Heiney sought a writ of mandamus to require filing, which the court
> finally dismissed on April 28, 2021.

(ECF Doc. 17, p. 10.)

## D.    Federal Habeas Corpus Petition

Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 in this

Court, with the assistance of counsel, on March 3, 2021.  (ECF Doc. 1.)  On that same date,

Petitioner filed a Motion to Stay and Hold in Abeyance.  (ECF Doc. 4.)  Petitioner was ordered

to file an Amended Petition on March 5, 2021 (ECF Doc. 6) and filed his First Amended Petition

for Writ of Habeas Corpus on March 18, 2021 (ECF Doc. 7)  On that same date, Petitioner filed

an Amended Motion to Stay and Hold in Abeyance.  (ECF Doc. 8.)  Petitioner was ordered to

14

file a Second Amended Petition on April 19, 2021 (ECF Doc. 11) and filed his Second Amended Petition for Writ of Habeas Corpus on May 2, 2021 (ECF Doc. 12).  On the same date, he again filed an Amended Motion to Stay and Hold in Abeyance.  (ECF Doc. 13.)

On May 21, 2021, the Magistrate Judge issued an Interim Report and Recommendation that the Amended Motion to Stay Petition for Habeas Corpus Relief and Hold in Abeyance (ECF Doc. 13) be denied, but that Petitioner be afforded an opportunity to file an amended petition deleting his unexhausted claims.  (ECF Doc. 16.)  The Magistrate Judge found that Petitioner had not presented a "mixed" petition warranting a stay because the four grounds for relief set forth in his Petition were reportedly fully exhausted in the state court (*id.* at pp. 3-4), because he had not demonstrated diligence in pursuing additional unexhausted claims (*id.* at pp. 4-5), and because he had not demonstrated that any unexhausted issues were potentially meritorious (*id.* at pp. 5-7).

Petitioner did not object to the Report and Recommendation, and instead filed a Third Amended Petition for Writ of Habeas Corpus on June 4, 2021, setting forth only those claims for relief that he asserted were exhausted before the state court.  (ECF Doc. 17.)  On June 9, 2021, this Court adopted the Report and Recommendation and Denied Petitioner's Amended Motion to Stay.  (ECF Doc. 18.)

Petitioner's Third Amended Petition (hereinafter "Petition") controls for purposes of this Court's review.  (ECF Doc. 17.)  The Petition asserts four grounds for relief:

1. Dr. Heiney's right to due process and a fair trial was violated under the United States Constitution Amendments V, and XIV as his convictions are not supported by sufficient evidence;

2. Dr. Heiney's was denied the right to a trial by jury under Amendments VI and XIV and Due Process under Amendment XIV;

3. Dr. Heiney's right to effective assistance of counsel was deprived under the United States Constitution Amendment VI, XIV; and

4. Dr. Heiney claims actual innocence to excuse any procedural defaults in his claims.

(*Id.* at pp. 1-4.)

On September 2, 2021, Respondents filed their Return of Writ.  (ECF Doc. 20.)

Petitioner filed his Traverse to Return of Writ ("Traverse") with the assistance of counsel on

October 18, 2021, attaching thirty-seven (37) exhibits.  (ECF Docs. 22 & 22-1 through 22-37.)

On that same date, with the assistance of counsel, he filed a Motion to Expand Record.  (ECF

Doc. 26.)  His attorney also filed a Motion to Withdraw as Attorney on that date.  (ECF Doc. 24.)

Following the filing of a supplement to the unopposed Motion to Withdraw (ECF Docs. 28, 29),

the Motion to Withdraw was granted on November 18, 2021, and Petitioner has since proceeded

in a *pro se* capacity.  (ECF Doc. 30.)

On September 30, 2022, the undersigned denied in part and granted in part Petitioner's

Motion to Expand the Record.  (ECF Doc. 41.)  The Court granted his request to admit certain

documents that were part of the state court record (*id.* at pp. 11-13 (admitting ECF Docs. 37-29

and 37-37)), denied the request to admit documents filed only as exhibits to Petitioner's later-

nullified petition for post-conviction relief because the exhibits were not considered by the state

court (*id.* at pp. 13-15), and denied without prejudice the request to admit records not presented

to the state court, subject to reconsideration or renewal if the Court "undertakes an analysis of

Petitioner's arguments for waiver of procedural default" (*id.* at pp. 15-17).

### III.    Law & Analysis

### A.    Standard of Review Under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–

132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the

effective date of the AEDPA.  *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  "As

amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies." *Id.* (citing 28 U.S.C. §§ 2254(a), (b), (c)).  Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted" unless the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).  The burden of proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

Under § 2254(d)(1), "[a] decision is 'contrary to' clearly established federal law when 'the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Otte v. Houk*, 654 F.3d 594, 599 (6th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).  "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1)" and "therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012).  "A state court's adjudication only results in an 'unreasonable application' of

clearly established federal law when 'the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Otte*, 654 F.3d at 599–600 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  "The state court's application of clearly established law must be objectively unreasonable." *Id.*

Under § 2254(d)(2), "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Burt v. Titlow*, 571 U.S. 12, 18 (2013) (quoting and citing 28 U.S.C. § 2254(d)(2)).  The Sixth Circuit has explained that "[a] state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews*, 486 F.3d at 889 (quoting and citing 28 U.S.C. § 2254(d)(2) and § 2254(e)(1)).  "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt*, 571 U.S. at 18 (internal citations and quotations omitted).

The Supreme Court has explained that under AEDPA "a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

"[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 562 U.S. at 102. The "standard is difficult to meet" and "was meant to be" because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). In short, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**B.     Legal Standard for Procedural Default**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. *See* 28 U.S.C. § 2254(b)(1)(A). A state defendant with federal constitutional claims must fairly present those claims to the state courts before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts").

To satisfy the fair presentation requirement, a habeas petitioner must present both the facts and legal theories underpinning his claims to the state courts. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). This means that the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *See, e.g.*, *Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987). A constitutional claim for relief must also be presented to the state's highest court to

satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48 (1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed in federal court.  *See Smith v. Ohio Dep't of Rehab. & Corr.,* 463 F.3d 426, 430 (6th Cir. 2006).  "Procedural barriers, such as . . . rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim."  *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural default applies rather than exhaustion.  *See Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith,* the Sixth Circuit articulated a four-prong analysis to be used when determining whether a claim is procedurally barred due to failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim, and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural

20

rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'" *See Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 552 N.E. 2d 894, 899 (Ohio 1990) (finding failure to present a claim to a state court of appeals constituted a waiver). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court may cause a procedural default that bars federal court review of the claims. *See Williams,* 460 F.3d at 806 (citing *Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

In addition to presenting the issue at each and every level of the state courts, a claim must have been "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim. *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir.1984). A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2)

reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *McMeans*, 228 F.3d at 681 (internal citation omitted).

To overcome procedural default, a petitioner must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750. "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## C.    Ground Three Should be Dismissed Based on Procedural Default

Petitioner argues in Ground Three that he was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments "when trial counsel failed to seek continuance to consult with a willing expert and or failed to call a willing and available expert." (ECF Doc. 17, pp. 3-4.)  Respondent argues this claim is procedurally defaulted because Petitioner did not timely appeal the issue to the Supreme Court of Ohio (ECF Doc. 20, pp. 42-45; ECF Doc. 35, pp. 54-55), and that the claim fails on its merits (ECF Doc. 20, at pp. 45-49; ECF Doc. 35, pp. 56-66).  Petitioner responds that he did not procedurally default on this claim and that any procedural default should be excused because of Covid-19 tolling orders or ineffective assistance of counsel.  (ECF Doc. 22, pp. 21-23.)  He also argues that any procedural default should be excused because is "actually innocent" of the crimes charged.  (*Id.* at 19-21.)  Finally, he argues that he should succeed on the merits of the claim.  (*Id.* at pp. 164-80.)

For the reasons set forth below, the undersigned finds Petitioner has procedurally defaulted on the claim in Ground Three of the Petition, and that the procedural default should not be excused based on cause and prejudice or a fundamental miscarriage of justice.

**1.      Claim in Ground Three was Procedurally Defaulted**

On federal habeas review, a district court cannot consider issues that were not presented at every level of the Ohio state court system.  *See Baston*, 282 F.Supp.2d at 661.  Where a petitioner has not pursued a claim "through the state's 'ordinary appellate review procedures,'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848), and "state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted," *id.* at 806.  Here, Petitioner did not appeal the decision denying his petition for post-conviction relief to the Supreme Court of Ohio, and that appeal is no longer available under Ohio law.  *See State v. Nichols*, 463 N.E.2d 375, 378 (Ohio 1984); Ohio S. Ct. Prac. R. 7.01(A)(4)(c).

Petitioner argues based on an overturned Seventh Circuit case that his failure to appeal to the Supreme Court of Ohio did not cause a procedural default because he "is not [] required to raise the issue in a petition for leave to appeal to the state supreme court to avoid waiver."  (ECF Doc. 22, pp. 3, 21 (citing *Boerckel v. O'Sullivan*, 135 F.3d 1194, 1196 (7th Cir. 1998), *rev'd*, 526 U.S. 838 (1999)).)  On the contrary, as the U.S. Supreme Court stated in overturning Petitioner's cited authority, the requirement that states be given a fair opportunity to hear claims at every level of their court systems is for the specific purpose of giving states' highest courts "the opportunity to resolve constitutional errors in the first instance," which "serves the comity interests that drive the exhaustion doctrine."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Because Petitioner failed to present the claim in Ground Three at every level of the Ohio state court system, the undersigned finds Ground Three was procedurally defaulted.

### 2. Procedural Default Should Not be Excused

To excuse his procedural default, Petitioner must either: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750; *Maupin*, 785 F.2d at 138.

Petitioner argues that any procedural default of Ground Three should be excused because confusion regarding Covid-19 tolling orders contributed to his late filing; he also notes that he was represented by counsel at the time, and argues any procedural default should be excused based on ineffective assistance of counsel if there is "prejudice in the form of default."  (ECF Doc. 22, pp. 21-22.)  He finally argues that any procedural default should be excused because he is "actually innocent" of the charges.  (*Id.* at pp. 19-21.)

### i. Petitioner Has Not Shown Cause and Prejudice to Excuse Default

The first way to overcome procedural default is to show "cause" for the default and that "actual prejudice" resulted from the alleged violation of federal law. *See Coleman*, 501 U.S. at 750; *Maupin*, 785 F.2d at 138.  To establish cause, a petitioner must point to "something external . . . that cannot be fairly attributed to him" and "show that some objective factor *external to the defense* impeded counsel's efforts to comply with the State's procedural rule."  *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)) (emphasis added). "[I]gnorance of the law and procedural requirements for filing a timely notice of appeal is insufficient to establish cause to excuse [a] procedural default."  *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).  Even "ignorance or inadvertence" by a petitioner's attorney is insufficient to support a finding of "cause" because petitioners must bear the risk of their own attorneys' errors.  *Coleman*, 501 U.S. at 753 (citing *Murray*, 477 U.S. at 488).

24

Petitioner does not offer persuasive arguments to support a finding of "cause" to excuse his untimely filing based on "confusing" Covid-19 tolling orders.  He asserts that his attorney submitted the notice of appeal and memoranda "within the time thought to be tolled" and argues the tolling provisions were "ambiguous as best" and the situation "unprecedented."  (ECF Doc. 22, pp. 22-23.)  However, he does not provide specific details to support his assertion that the tolling orders conflicted with one another, nor does he explain how any confusion occurred or why it is excusable.  Neither Petitioner's ignorance nor any "ignorance or inadvertence" on the part of his counsel can support a finding of "cause" to excuse procedural default.  *See Coleman*, 501 U.S. at 753.  His citation to a dated Supreme Court case regarding indigent filing fees does not change this analysis.  (ECF Doc. 22, p. 23 (citing *Burns v. Ohio*, 522 U.S. 257 (1959)).)  For the reasons stated, Petitioner's generalized arguments regarding "confusing" tolling orders do not support a finding of "cause" to excuse procedural default.

Petitioner also states without further elucidation that "the *Strickland* standard for ineffectiveness will have been met, and the default excused" if procedural default results from the failed Ohio Supreme Court filing.  (ECF Doc. 22, p. 22.)  In effect, he is arguing that his attorney's failure to file a timely Ohio Supreme Court appeal is *de facto* ineffective assistance of counsel if that failure caused a procedural default.  This argument must fail for several reasons.  First, he has offered no argument as to how the alleged failure to properly interpret "confusing" tolling orders amounts to ineffective assistance of counsel, rather than simple ignorance or inadvertence.  Second, he has not shown—as necessary to present ineffective assistance of *appellate* counsel as "cause" to excuse procedural default of another claim—that he presented his claim for ineffective assistance of *appellate* counsel at every level of the state court system.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding even an ineffective assistance of

counsel claim raised to cure a procedural default must have been presented in state court to "ensure[] that the States' interest in correcting their own mistakes is respected in all federal habeas cases") (citation omitted).  Finally, and most importantly, Petitioner "'cannot claim constitutionally ineffective assistance of counsel' in proceedings where '[t]here is no constitutional right to an attorney,' such as 'state post-conviction proceedings.'"  *McClain v. Kelly*, 631 Fed. Appx. 422, 429 (2015) (citing *Murray*, 477 U.S. at 492; quoting *Coleman*, 501 U.S. at 752).  For this reason, "alleged attorney error in state post-conviction proceedings 'cannot constitute cause to excuse [a] default in federal habeas.'"  *McClain*, 631 Fed. Appx. at 429 (quoting *Coleman*, 501 U.S. at 757).

The undersigned finds that Petitioner has not demonstrated "cause" to excuse the procedural default resulting from his failure to timely appeal to the Ohio Supreme Court.

### ii.    Petitioner Has Failed to Show a Fundamental Miscarriage of Justice

The undersigned next turns to whether Petitioner's procedural default of Ground Three may be excused because there will be a fundamental miscarriage of justice if his claim is not considered.  *See Coleman*, 501 U.S. at 750.  Petitioner argues that any procedural default should be excused because he is "actually innocent, and it was only through the State's violation of his herein listed constitutional rights that the State was able to obtain convictions on the felony and misdemeanor charges."  (ECF Doc. 22, p. 20.)  He notes that he has presented "reliable exculpatory evidence of his innocence which entitles him to such [excused] default."  (*Id.*)

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren*, 440 F.3d at 764 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). The Supreme Court explains: "the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the

individual interest in justice that arises in the extraordinary case." *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, [the] [Supreme] Court [has] explicitly tied the miscarriage of justice exception to the petitioner's innocence." *Id.* at 322.

For an actual innocence claim to be credible, a petitioner must "support his allegations of constitutional error with *new reliable evidence*—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324 (emphasis added).   He must further "show that it is more likely than not that *no reasonable juror* would have convicted him in light of the new evidence."  *Id.* at 327 (emphasis added).  This standard is intended to permit petitioners with "truly extraordinary" cases a "meaningful avenue by which to avoid a manifest injustice."  *Id.* (internal quotations omitted).  Notably, "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

While timeliness and diligence are not explicitly required to show actual innocence, "[u]nexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."  *McQuiggins v. Perkins*, 569 U.S. 383, 399 (2013); *accord Eberle v. Warden*, 532 Fed. Appx. 605, 612 (6th Cir. 2013) ("Although a petitioner who asserts a convincing actual-innocence claim does not have to 'prove diligence to cross a federal court's threshold,' timing remains 'a factor relevant in evaluating the reliability of a petitioner's proof of innocence.'" (citing *McQuiggins*, 569 U.S. at 399)).

Petitioner's "actual innocence" argument is first articulated as the fourth ground for relief in his Petition, where it is described as a claim of "actual innocence to excuse any procedural defaults in his claims."[2]  (ECF Doc. 17, p. 4.)  He describes the supporting evidence as follows:

> Heiney has *deposition testimony* from one of the complaint's [sic], attested to after the conviction, that, inter alia, *she was not compelled to submit by force, that no force was used, and that she always felt free to leave the examination room*. This testimony does not contradict any trial testimony, as there was no testimony of actual force and the theory of the case was based upon a force standard inapplicable to the case. On appeal, the errant force standard was found to be in error, and the convictions upheld based upon inferences foreclosed by this testimony.

(*Id*. (emphasis added).)  Petitioner renews his actual innocence argument in the Traverse, arguing generally that "reliable exculpatory evidence of his innocence" supports excusing any procedural default; in support, he cites to exhibits he describes as "expanding the record supplemental materials."  (ECF Doc. 22, p. 20.)  He argues generally that the listed exhibits "are being offered to 'expand the record,'" and asserts that such expansion is permitted under Habeas Rule 7.  (*Id*. at pp. 20-21.)  The only specific argument he offers as to which of these new records support his assertion of actual innocence is as follows:

> Alleged victim [K.O.] has testified in a recently dismissed civil suit specifically that she was not subjected to force, that her will was not overcome by force, and that she felt no physical or psychological threat or fear from Dr. Heiney. [K.O.] v. Heiney, Lucas County, Ohio, No. CI00201704961, See expanding the record Exhibit xiD. Though dispositive of the Gross Sexual Imposition convictions, when this Court previously denied Dr. Heiney's motion to Stay this Petition and return to State Court, the State did not object to the denial nor to the third amended Habeas Petition.

(*Id*. (citing "Exhibit xiD" (ECF Doc. 22-34, pp. 191-304 ("K.O. Depo.")).)  Without specifically tying it to his actual innocence argument, Petitioner also asserts in his factual summary that that a witness who testified at trial that Petitioner had an erection during a medical examination

---

[2] The undersigned further finds in Section III.D., *infra*, that "actual innocence" is not cognizable as an independent claim for federal habeas relief.

"admitted later in civil deposition that the testimony regarding an erection was in fact **false**." (*Id.* at p. 37 (emphasis in original) (citing "Exhibit v" (ECF Doc. 22-9 ("L.G. Depo.")).)

In a September 20, 2022 order, this Court denied without prejudice Petitioner's motion to expand the record to include exhibits that were not presented to the state court, "subject to reconsideration or renewal in the event that this Court . . . undertakes an analysis of Petitioner's arguments for waiver of procedural default." (ECF Doc. 41, p. 17.) While Petitioner has not requested reconsideration, the undersigned finds reconsideration is warranted with respect to the deposition transcript that is the focus of Petitioner's "actual innocence" argument (ECF Doc. 22, p. 20-21 (citing K.O. Depo.)) and the deposition transcript that allegedly indicates certain witness testimony at trial was false (*id.* at p. 37 (citing L.G. Depo.)). The undersigned therefore **ADMITS** those two deposition transcripts (ECF Doc. 22-9; ECF Doc. 22-34, pp. 191-304) into evidence for the limited purpose of informing the procedural default analysis on the issue of "actual innocence."[3] *See Clemmons v. Warden, Lebanon Corr. Inst.*, No. 3:11-CV-465, 2012 WL 4811122, at *8 (S.D. Ohio Oct. 10, 2012) (finding federal habeas limitation to the record before the state court "does not by its own terms apply to the actual innocence exception" because "[t]he premise of the actual innocence exception is that the habeas petitioner is presenting **new** evidence not considered by the state courts" (emphasis in original)), *report and recommendation adopted*, No. C-3:11-CV-465, 2013 WL 157142 (S.D. Ohio Jan. 15, 2013).

Respondent argues generally that Petitioner has failed to identify "new reliable evidence" to demonstrate his actual innocence. (ECF Doc. 20, pp. 49-50.) As to K.O.'s alleged post-trial testimony that she was not subject to "force" by Petitioner, Respondent argues that testimony is

---

[3] Petitioner has not articulated sufficiently developed arguments to support the admission of other new evidence to support his "actual innocence" argument, and has therefore waived any argument for the admission of additional new evidence. *See McPherson*, 125 F.3d at 995–96.

not inconsistent with her criminal trial testimony.  (ECF Doc. 35, pp. 23-24.)  Petitioner has acknowledged the same in his Petition.  (ECF Doc. 17, p. 4.)  A review of the relevant post-trial testimony reveals that K.O. agreed with counsel that Petitioner "did not try to exert any sort of mental control or mental . . . dominion" over her, that "there was no physical intimidation," and that Petitioner "never used any sort of physical force against [her] will to keep [her] from leaving . . . []or to physically injure [her]."  (ECF Doc. 22-34, pp. 283-85.)

As to L.G.'s alleged post-trial testimony admitting that certain trial testimony was false, Respondent argues that the deposition transcript "do[es] not support the conclusion that L.G. ever recanted her testimony that she saw that Heiney had an erection during an examination of her."  (ECF Doc. 35, pp. 13-14.)  Instead, Respondent says the post-trial testimony indicated L.G. gave the wrong *date* at the criminal trial—saying she saw an erection at an appointment on April 4 when she actually saw one on April 15—and that she admitted only that she could not confirm with 100% certainty that what she saw was an erection.  (*Id.* at p. 14.)  A review of the post-trial deposition transcript reveals L.G. did disagree with her prior trial testimony that she observed Petitioner with an erection at her second appointment and returned for two more appointments after that, but clarified that she actually observed an erection at the second "incident" when Petitioner pulled her pants and underwear down, which was at her fourth and final appointment.  (ECF Doc. 22-9, pp. 299-304, 307-09, 325-27.)  The transcript also indicates L.G. testified in the post-trial deposition that she could not "confirm 100 percent" that Petitioner had an erection because she did not "look under his pants," but that she saw what she believed was an erection and felt confident that Petitioner did have an erection.  (*Id.* at pp. 411-13.)

Returning to the standard that Petitioner must "support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial," *Schlup*, 513 U.S. at 324, the

undersigned finds that Petitioner has not presented "new reliable evidence" sufficient to support a finding of "actual innocence" to excuse his procedural default.  He has not shown how K.O.'s post-trial testimony regarding the lack of "physical force" or "mental control" or L.G.'s post-trial clarifications regarding her observation that Petitioner had an erection at a medical appointment made it "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327.  Certainly, renewed attacks on witness credibility are insufficient to prove actual innocence to excuse a procedural bar.  *See In Re Byrd*, 269 F.3d 561, 577 (6th Cir. 2001) (citation omitted); *Gardner v. MacLaren*, No. 13-CV-15051, 2014 U.S. Dist. LEXIS 153348, at *20-21 (E.D.Mich. Oct. 29, 2014).  Petitioner has not shown that new information, clarifications, or even inconsistencies revealed in the post-trial depositions prove his "factual innocence, beyond mere legal insufficiency." *Bousley*, 523 U.S. at 623.

For the reasons set forth above, the undersigned finds the claim in Ground Three was procedurally defaulted, and Petitioner not met his burden to show cause and prejudice or a fundamental miscarriage of justice to excuse that default.  Accordingly, the undersigned recommends that the Court **DISMISS** Ground Three with prejudice.[4]

## D.     Ground Four Should be Dismissed as Noncognizable

To the extent Petitioner is seeking to assert "actual innocence" as an independent ground for federal habeas relief in Ground Four of the Petition, that claim must fail.  The U.S. Supreme Court has explained that a claim of actual innocence can provide a gateway to overcome procedural default, but is not cognizable on federal habeas review.  *Herrera v. Collins,* 506 U.S. 390, 416 (1993).  The *Herrera* court explained:

> Federal habeas review of state convictions has traditionally been limited to claims of constitutional violations occurring in the course of the underlying state criminal

---

[4] Because the undersigned recommends dismissal of Ground Three based on procedural default, no recommendation is made as to the merits of Ground Three.

proceedings.  Our federal habeas cases have treated claims of "actual innocence," not as an independent constitutional claim, but as a basis upon which a habeas petitioner may have an independent constitutional claim considered on the merits.

*Herrera,* 506 U.S. at 416; *see also Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (noting

Sixth Circuit cases support a finding that free-standing claims of innocence are not cognizable on

federal habeas review); *Hitsman v. Berghuis*, No. 1:15-CV-810, 2017 WL 1387143 (W.D. Mich.

Mar. 24, 2017) (denying motion to stay where only new claim was actual innocence), *report and*

*recommendation adopted,* No. 1:15-CV-810, 2017 WL 1366502 (W.D. Mich. Apr. 14, 2017).

For the reasons stated above, the undersigned finds the claim in Ground Four of the

Petition does not present an independent ground for habeas relief.  Accordingly, the undersigned

recommends that the Court **DISMISS** Ground Four with prejudice.

### E.     Ground Two Should be Dismissed as Noncognizable and/or Denied on the Merits

Petitioner argues in Ground Two that he was denied his right to a trial by jury under the

Sixth and Fourteenth Amendments and due process under the Fourteenth Amendment when "the

trial Court gave a jury instruction related to an essential element of the crime which was not

cognizable under Ohio law."  (ECF Doc. 17, pp. 2-3.)  He acknowledges that the state court of

appeals found a portion of the relevant jury instruction—pertaining to the "force" standard under

Ohio law—to be erroneous, but found the error to be harmless.  (*Id*.)  He argues that he was

denied due process because the court of appeals "used the wrong standard of harmless error"

when the error should have been deemed "structural error" or "the *Chapman* standard of

'harmless error beyond a reasonable doubt'" should have been applied.  (*Id.* at p. 3.)

Respondent argues that the applicable standard for this claim was not "fairly presented"

in the state court because Petitioner did not argue to the state court of appeals that the alleged

error was subject either a "structural error" or *Chapman* standard of review.  (ECF Doc. 20, pp.

39-41; ECF Doc. 35, p. 53.)  He also argues that the claim must fail on its merits.  (ECF Doc. 20, p. 42; ECF Doc. 35, pp. 52-54.)  These arguments will be addressed in turn.

### 1.    Petitioner Fairly Presented a Constitutional Claim to the State Courts

The "fair presentation" standard requires a petitioner to present both the facts and legal theories underpinning his federal habeas claims to the state courts, *see McMeans*, 228 F.3d at 681, and to present the claims as federal constitutional issues, not merely as issues arising under state law, *see, e.g.*, *Baldwin*, 541 U.S. at 33-34; *Franklin*, 811 F.2d at 324-25.  A petitioner's constitutional claims for relief must also be presented to the state's highest court to satisfy the fair presentation requirement.  *See O'Sullivan*, 526 U.S. at 845-48; *Hafley*, 902 F.2d at 483.

Here, Petitioner's brief to the state court of appeals in support of his direct appeal identified the relevant assignment of error as follows:

> Error XI: The trial court's jury instructions, particularly as to the intent necessary to prove Gross Sexual Imposition and what constitutes force, were wrong in that they contracted the clear statutory language and case law.

(ECF Doc. 40-18, p. 6.)  However, the same assignment of error is captioned differently later in that same brief, stating instead:

> ASSIGNMENT OF ERROR XI: The trial court erred and abused its discretion by giving the jury an instruction that it could essentially imply psychological force because of the doctor – patient relationship.  This is not the law and, as such, *resulted in Heiney having his right to due process of law and a fair trial violated both under the federal and state constitutions*.

(*Id.* at pp. 54-55 (emphasis added).)  Petitioner argues in the body of the brief only that the "trial court's jury instructions are reviewed for abuse of discretion," and that "[t]he trial court *abused its discretion* by so advising the jury that this was an accurate instruction of law." (*Id.* at 55-56 (emphasis added; citation omitted).)  The undersigned can find no reference to "structural error" or the *Chapman* standard in this brief or Petitioner's reply brief.  (ECF. Docs. 40-18, 40-20). When the state court of appeals addressed this assignment of error, it did not apply the requested

33

"abuse of discretion" standard, but rather undertook "a de novo review to determine whether [the] disputed jury instruction correctly stated the applicable law." *Heiney*, 117 N.E.3d at 1066 (citation omitted).

Petitioner's subsequent appeal to the Supreme Court of Ohio set forth the following constitutional question:

> May it be "harmless error" when Defendant's right to a fair trial before an impartial jury and due process of law under the Ohio and United States Constitutions is violated when a faulty jury instruction, which abrogates one of the elements of the crime that the State must prove beyond a reasonable doubt, is presented to the Jury?

(ECF Doc. 40-22.)  The appeal also raised the following proposition of law:

> Proposition of Law V: An improper Jury Instruction which allows a Jury to find guilt beyond a reasonable doubt without finding all of the material elements beyond a reasonable doubt is a fundamental denial of the Defendant's rights to Due Process of Law and a fair trial under the Ohio and United States Constitutions: when an instruction presents easier met definition of a fact that must be proven there is no alternative but reversal because the Court may not enter a directed verdict of guilty, and or the improper definition amounts to structural error[.]

(ECF Doc. 40-24, pp. 2-3.)

Although Petitioner's specific arguments as to the appropriate standard of review—now asserted to be "structural error" or the *Chapman* standard—were not presented to the state court of appeals, the undersigned finds it was sufficient to avoid wholesale procedural default that Petitioner argued to the state court that the erroneous jury instruction "resulted in Heiney having his right to due process of law and a fair trial violated both under the federal and state constitutions."  (ECF Doc. 40-18, pp. 54-55.)  The undersigned therefore finds Petitioner "fairly presented" his claim in Ground Two that the "force" jury instruction violated his rights to due process and a fair trial under the U.S. Constitution.  He did not, however, "fairly present" his more recent arguments as to the proper standard of review.  The undersigned will therefore proceed to a review of the merits of the claim in Ground Two.

34

For the reasons explained below, the undersigned finds that Ground Two should be **DISMISSED** to the extent Petitioner is seeking to challenge the jury instruction under state law and should be **DENIED** on the merits to the extent Petitioner contends the jury instruction violated his due process rights.

### 2.    Habeas Review of State Law Finding Regarding Jury Instructions

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

 "Because 'federal habeas corpus relief does not lie for errors of state law,'" federal courts "may grant the writ based on errors in state jury instructions only in extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).  "To warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that required to demonstrate plain error on appeal.'"  *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001).  Thus, the question on federal habeas review is not whether the state trial court failed to cure a particular ailing jury instruction, but "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Daniels*, 501 F.3d at 741 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

**3.      State Court Adjudication of Jury Instruction Challenge**

Petitioner's challenge to the state trial court's "force" jury instruction was adjudicated on

the merits by the state court of appeals, which made the following findings:

{¶ 132} In his eleventh assignment of error ("Error XI"), Heiney alleges that the trial court erred in instructing the jury on the issue of "force or threat of force." Heiney argues that the jury instruction improperly allowed the jury to "imply that there was psychological 'pressure' created by the doctor-patient relationship and this could be interpreted to be 'force' by 'compulsion.'"

{¶ 133} A trial court is "obligated to provide jury instructions that correctly and completely state the law" when those instructions are "warranted by the evidence presented in a case." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22. While we afford trial courts "broad discretion to decide how to fashion jury instructions," we still require courts to "'give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.'" *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. While an appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion, an appellate court applies a de novo review to determine whether a disputed jury instruction correctly stated the applicable law. *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, 2016 WL 3216241, ¶ 30; *Cromer* at ¶ 22 ("The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review.").

{¶ 134} The trial gave the following instruction on "force":

Force means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing. A victim need not prove physical resistance to prove force. As long as the state shows that the defendant overcame the victim's will by fear or duress, it has established the force element. Psychological pressure – the force need not be overt or physically brutal. *Subtle or psychological pressure that causes a victim to be overcome by fear or duress constitutes force.* * * * Dr./Patient relationship – while the doctor-patient relationship does not create an inference of force, you may consider such relationship between the parties as a relevant factor in determining whether the victim's will was overcome by fear or duress. The sufficiency of force depends upon the totality of the circumstances including the medical professional/patient relationship. (Emphasis added.)

{¶ 135} As we have already discussed at length above, the italicized statement regarding the adequacy of mere "subtle or psychological pressure" as sufficient "force" is the so-called "*Eskridge* rule," which has been applied to sexual abuse

36

cases involving a defendant with parental or similar authority over a child, and has been extended to situations involving closely-analogous relationships between an authority figure and victim. *See, e.g. State v. Stober*, 3d Dist. Putnam No. 12-13-09, 2014-Ohio-1568, 2014 WL 1464226, ¶ 37-39 (coach/teacher and student); *Fortson*, 8th Dist. Cuyahoga No. 92337, 2010-Ohio-2337, 2010 WL 2106010, ¶ 86 (correctional officer and female inmate); *Oddi*, 5th Dist. Delaware No. 02CAA01005, 2002-Ohio-5926, 2002 WL 31417665, ¶ 57 (driving instructor and student). As established by the Supreme Court of Ohio in *Schaim*, there must be some physical force, or threat of physical force, apart from the sexual contact. *Schaim*, 65 Ohio St.3d at paragraph one of syllabus, 65 Ohio St.3d 51, 600 N.E.2d 661. Because this case does not concern a parent-child or similar relationship of authority, the trial court's inclusion of the one sentence encompassing the "*Eskridge* rule" was error.

{¶ 136} Where there are errors within a jury instruction, "a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.'" *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995), quoting *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990).

{¶ 137} We find it unlikely that the trial court's inclusion of one sentence encompassing the inapplicable "*Eskridge* rule" misled the jury in a manner affecting Heiney's substantial rights. The remainder of the disputed jury instruction correctly and accurately states the applicable law as applied to the facts of this case, which we discussed at length when considering the sufficiency of the evidence supporting "force or threat of force." Most importantly, the trial court correctly stated that "the doctor-patient relationship does not create an inference of force," but that it is "a relevant factor in determining whether the victim's will was overcome by fear or duress."

{¶ 138} Moreover, it is unlikely that the jury relied upon the inapplicable sentence to find *non*-physical force, alone, supported the GSI convictions because the state correctly argued the presence of *physical* force. In its closing, the state argued:

> So what evidence of force has been presented to you throughout the course of this trial? Let's start with [M.S.] It is true that Jake Heiney asked for her permission before he palpated her breast tissue and gave her that breast exam. * * * Jake Heiney did not, however, ask for her permission when he pulled her bra away from her breasts and shoved that gauze into the cup of her bra with no gloves on. With no one else in the room, Dr. Heiney positioned between her and the door, and that door closed. He pulled her bra away, he exposed her breasts, and he placed that gauze underneath her breast while commenting on her white bra. It was subtle, it was slight, but it was force. She trusted him.

So what about [K.O.]? What evidence of force was presented in [her] case? Here it's much more obvious. Dr. Heiney never asked for her permission before he touched her breasts. He just pulled down her bra and felt her up three separate times. And when she was bent over touching her toes and he yanked down her pants and her underwear, he didn't ask for her permission. He didn't warn her. He didn't tell her why he was doing it. He just did it.

{¶ 139} Thus, because the remainder of the jury instruction was legally correct and applicable to the facts, and because the state properly argued that *physical* force supported the GSI convictions, we find that the trial court's inclusion of the one sentence relating to the inapplicable "*Eskridge* rule" was harmless error. Accordingly, the eleventh assignment of error (Error XI) is not well-taken.

*Heiney*, 117 N.E.3d at 1065–67 (emphasis in original).

### 4.  Claim in Ground Two is Non-Cognizable and/or Without Merit

In Ground Two, Petitioner alleges that his constitutional rights were violated when the trial court "gave a jury instruction related to an essential element of the crime which was not cognizable under Ohio law." (ECF Doc. 17, p. 2.) Specifically, he argues "the entire case appears to have been predicated upon the application of a lessened 'force' standard under Ohio law which is only applicable to the rape of a child by a parental figure," with the instruction given under that inapplicable standard "found . . . to be error as it was a false statement of Ohio law in the context."[5]  (*Id.* at p. 3.)

To the extent that Petitioner is seeking federal habeas relief based on an assertion that the trial court's "force" jury instruction violated state law, he fails to state a claim upon which federal habeas relief may be granted. As explained above, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at

---

[5] As noted above, Petitioner's additional argument that the state court of appeals applied the wrong standard of review was not "fairly presented" at every level of the state court proceedings, and is not properly before this Court. Indeed, Petitioner acknowledges in his Traverse that his argument regarding the standard of review was not "adjudicated on the merits in the State court proceedings." (ECF Doc. 22, p. 153 (citation omitted).)

67-68.  Accordingly, the undersigned recommends that the Court **DISMISS** Ground Two as not cognizable to the extent that the claim is based on asserted violations of state law.

Conversely, to the extent he is relying on an argument that his constitutional rights were violated because the jury instruction given for an essential element of the crime was not cognizable under Ohio law (ECF Doc. 17, p. 2), that argument must fail on the merits.  For his constitutional arguments to succeed, Petitioner must show not only that the jury instruction was "erroneous" but that it was "so infirm that [it] rendered the entire trial fundamentally unfair." *Buell*, 274 F.3d at 355 (citation and internal quotation marks omitted); *see also Daniels*, 501 F.3d at 741 (stating question on federal habeas review is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process") (quoting *Cupp*, 414 U.S. at 147).  Petitioner has failed to demonstrate that the "force" jury instruction rendered his trial fundamentally unfair.

The state court of appeals found that it was error to include the relevant language—that "[s]ubtle or psychological pressure that causes a victim to be overcome by fear or duress constitutes force"—in the jury instruction, but went on to find it unlikely that inclusion of such language "misled the jury in a manner affecting Heiney's substantial rights" because the jury instruction otherwise "correctly and accurately state[d] the applicable law as applied to the facts of th[e] case," including correctly stating "that 'the doctor-patient relationship does not create an inference of force,' but that it is 'a relevant factor in determining whether the victim's will was overcome by fear and duress.'"  *Heiney*, 117 N.E.3d at 1066–67.  The court also concluded based on its review of the record that it was "unlikely that the jury relied upon the inapplicable sentence to find *non*-physical force, alone, supported the GSI convictions because the state correctly argued the presence of *physical* force."  *Id.* at 1067 (emphasis in original).

39

Petitioner argues that the instruction "relieved the State of its burden of proving every element of the crime beyond a reasonable doubt," contrary to *In re Winship*, 397 U.S. 358, 364 (1970).  (ECF Doc. 22, p. 155.)  Thus, he appears to assert that the erroneous language in the challenged jury instruction allowed the government to prove the element of "force" under a standard less than beyond a reasonable doubt.  The *Winship* court held: "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. at 364.  Here, there is no dispute that the trial court correctly instructed the jury as follows:

- force is established by a showing that "the defendant overcame the victim's will by fear or duress";

- "the force need not be overt or physically brutal";

- "while the doctor-patient relationship does not create an inference of force, [the jury] may consider such relationship between the parties as a relevant factor in determining whether the victim's will was overcome by fear or duress"; and

- "[t]he sufficiency of the force depends on the totality of the circumstances including the medical professional/patient relationship."

*Heiney*, 117 N.E.3d at 1066.  There is also no dispute that the government argued in closing that the use of physical force had been proven when Petitioner pulled clothing away or down without permission, sometimes without warning, with no gloves on, with no one else in the room, while positioned between the victim and the door, with the door closed.  *Id.* at 1067.  In this circumstance, the undersigned cannot find that any alleged error in the "force" jury instruction was "so infirm that [it] rendered the entire trial fundamentally unfair."  *Buell*, 274 F.3d at 355.

For the reasons set forth above, the undersigned finds Petitioner has failed to show that the jury instruction was so infirm as to render the entire trial fundamentally unfair.  *See Buell*, 274 F.3d at 366.  Petitioner has also failed to demonstrate that the court of appeals finding was an unreasonable application of federal law, or that the state appellate court's adjudication of his

40

claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).

Accordingly, to the extent Petitioner is asserting a federal constitutional claim in Ground Two, the undersigned recommends that the Court **DENY** Ground Two on its merits.

## F.    Ground One Should be Denied on the Merits

In Ground One, Petitioner asserts that he was denied due process of law because his convictions were "not supported by sufficient evidence."  (ECF Doc. 17, p. 1.)  Specifically, he asserts the following violations: no evidence of compulsory force was presented to the jury; no evidence of sexual gratification was presented to the jury; no evidence of "alteration" of medical records was presented to the jury; "inadmissible character evidence" was presented to the jury; "instructions were not given to the jury"; and "other cumulative errors."  (*Id.* at pp. 1-2.)  He spends over 100 pages of his Traverse expanding on these arguments and asserting additional arguments that were not specifically set forth in his Petition.  (ECF Doc. 22, pp. 42-152.)

Respondent argues that many of the issues Petitioner raises under the umbrella of Ground One, in the Petition and/or Traverse, were not presented to the state trial court or appealed to the Supreme Court of Ohio.  (ECF Doc. 20, pp. 37-38; ECF Doc. 35, pp. 16-21, 31-52.)  With respect to those issues that were fairly presented to the state courts and appealed to the Supreme Court of Ohio, Respondent argues the claims in Ground One must be denied on the merits.  (ECF Doc. 20, pp. 22-37; ECF Doc. 35, pp. 22-31.)

The undersigned finds the following alleged due process claims were fairly presented to the state courts and pursued through the state's ordinary appellate review procedures, as

41

necessary for consideration before this Court: (1) Petitioner's conviction for Gross Sexual Imposition was not supported by sufficient evidence (ECF Doc. 17, p. 1); and (2) Petitioner's conviction for Tampering with Records was not supported by sufficient evidence (*id.* at pp. 1-2). These are the claims that will be addressed on the merits herein.

### 1.    Certain Claims Raised Under the Umbrella of Ground One are Not Properly Before this Court and Will Not Be Addressed Herein

The undersigned agrees with Respondent that the following due process claims were not pursued through the state's "ordinary appellate review procedures," *see Williams*, 460 F.3d at 806, and are therefore not properly before this Court: (1) "inadmissible character evidence was presented" (ECF Doc. 17, p. 2); and (2) "other cumulative errors" (*id.*).  These vaguely described claims appear to reference assignments of error VII and VIII in the state court of appeals proceedings, *see Heiney*, 117 N.E.3d at 1047-48, which Petitioner did not appeal to the Supreme Court of Ohio.  (ECF Doc. 40-22; ECF Doc. 40-24, pp. 2-3.)  Petitioner's additional reference to "instructions . . . not given to the jury" (ECF Doc. 17, p. 2), to the extent it was pursued through his Ohio Supreme Court Appeal, was already addressed in Section III.E., *supra*.  As to the additional arguments raised by Petitioner for the first time in his Traverse (ECF Doc. 22, pp. 106-52), those issues are not properly before this Court and will not be addressed herein.[6]  *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005).

The undersigned also finds Petitioner's arguments regarding *Bostock v. Clayton Cty.*, 140 S.Ct. 1731 (2020), were not "fairly presented" to the state courts, *see Fulcher*, 444 F.3d at 798, and are not properly before this Court.  (ECF Doc. 17, p. 2; ECF Doc. 22, pp. 81-106.)  As to this

---

[6] All but one of these arguments were either not "fairly presented" to the state courts, *see Fulcher*, 444 F.3d at 798, or not pursued through the state's "ordinary appellate review procedures," *see Williams*, 460 F.3d at 806.  The only claim raised for the first time in the Traverse that was fairly presented and appealed to the Ohio Supreme Court pertained to alleged violations of due process and the Sixth Amendment in connection with testimony by Dr. Foetisch.  (ECF Doc. 22, pp. 137-46; ECF Doc. 40-18, pp. 5, 33-39; ECF Doc. 40-22; ECF Doc. 40-24, pp. 2-3.)

claim, it is noted that Petitioner sought a stay of this action in 2021 so that he could exhaust his

state court remedies with respect to, *inter alia*, a claim under *Bostock*.  (ECF Docs. 4, 8, 13.)

The Magistrate Judge recommended that the stay be denied, observing that Petitioner had not

shown diligence in seeking to exhaust any *Bostock*-related claims in the year since that Supreme

Court decision was issued, and had not persuasively explained how *Bostock* would support

federal habeas relief.  (ECF Doc. 16.)  The Court adopted the recommendation and denied the

motion to stay.  (ECF Doc. 18.)  Without thereafter presenting evidence that he had since fairly

presented his *Bostock*-related claim to the state court and pursued the claim through the state

court's ordinary appellate review process, Petitioner nevertheless renewed his *Bostock* argument

in his Petition and Traverse.  (ECF Doc. 17, p. 2; ECF Doc. 22, pp. 81-106.)  That claim was not

"fairly presented" to the state courts and will not be addressed herein.

 The undersigned next turns to the sufficiency-of-the-evidence claims properly asserted by

Petitioner in Ground One of the Petition.

### 2. Legal Framework for Sufficiency of Evidence Claims

 A sufficiency-of-the-evidence claim is cognizable on federal habeas review.  *See In re

Winship*, 397 U.S. at 364.  In reviewing such a claim, the relevant inquiry is "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v.

Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

 In determining the sufficiency of the evidence, a court does "not reweigh the evidence,

re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury."  *Brown

v. Koneth*, 567 F.3d 191, 205 (6th Cir. 2009); *see also Matthews v. Abramajtys,* 319 F.3d 780,

788 (6th Cir. 2003).  This "inquiry does not focus on whether the trier of fact made the correct

guilt or innocence determination, but rather whether it made a *rational* decision to convict or

acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).  "Circumstantial

evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to

exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992

(6th Cir. 2000) (internal citations, quotations, and alterations omitted); *see also Durr v. Mitchell*,

487 F.3d 423, 449 (6th Cir. 2007) ("circumstantial evidence is entitled to equal weight as direct

evidence").

On federal habeas review, an additional layer of deference applies to questions of

sufficiency of the evidence.  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012).  "First, deference

should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; [and] second,

deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as

dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v.

Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  The Sixth Circuit has explained the two-step

deferential analysis as follows:

> First, we must ask whether the evidence itself was sufficient to convict under
> Jackson. The inquiry ends if the panel determines that there was sufficient evidence
> to convict [the petitioner].  If we find that the evidence is insufficient to convict,
> we must then apply AEDPA deference and ask whether the state court was
> "objectively unreasonable" in concluding that a rational trier of fact could find
> [petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010).  Thus, even if this Court were "to

conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable

doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency

determination as long as it is not unreasonable."  *Brown*, 567 F.3d at 205 (citing 28 U.S.C. §

2254(d)(2)) (emphasis in original)*; see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009).

### 3.      Gross Sexual Imposition

In challenging the sufficiency of the evidence as to the gross sexual imposition charges, Petitioner asserts that he was denied due process of law because the jury was not presented evidence of "compulsory force" or "sexual gratification."  (ECF Doc. 17, p. 1.)  As to "force," he argues the state court's decision was unreasonable because "the jury was incorrectly instructed on the element of force."  (ECF Doc. 22, p. 43.)  He notes that "[n]one of the witnesses [we]re actually asked if they were compelled by force to submit to sexual contact."  (*Id.*)

As to "sexual gratification," Petitioner argues the state did not present evidence that he "act[ed] outside of established medical protocol with any sexual intent, only insinuation."  (*Id.*)  He argues that it is a due process violation to find "sufficient evidence of sexual gratification based upon conduct which medical professionals, and first responders are *required* to conduct, i.e., hav[ing] physical contact with otherwise sensitive areas of a patient's body."  (ECF Doc. 17, p. 2 (emphasis in original).)

### i.      Evidence Was Sufficient Under *Jackson* Standard

The first inquiry required of this Court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  While Petitioner acknowledges the two levels of deference in the applicable standard, he limits his argument to the second level of deference—whether "the state court was 'objectively unreasonable' in concluding that a rational trier of fact could find [petitioner] guilty beyond a reasonable doubt."  *Stewart*, 595 F.3d at 653.  (ECF Doc. 22, p. 43.)  Because Petitioner focuses his argument on the second level of deference, the undersigned will proceed to that analysis.

45

ii.     **State Court of Appeals' Sufficiency Determination Was Reasonable**

The state court of appeals addressed Petitioner's sufficiency claim as to his conviction for

gross sexual imposition as follows:

{¶ 89} Next, we consider whether the trial court erred by denying Heiney's motion for acquittal under Crim.R. 29(A) with respect to his convictions for gross sexual imposition under R.C. 2907.05(A)(1) (first assignment of error, "Error I").

{¶ 90} Heiney was convicted of two counts of gross sexual imposition under R.C. 2907.05(A)(1), which provides that "[n]o person shall have *sexual contact* with another * * * when * * * [t]he offender purposely compels the other person * * * to submit by *force or threat of force*." (emphasis added). Heiney argues that there was insufficient evidence of "sexual contact" and "force or threat of force."

**A. "Sexual Contact"**

{¶ 91} Heiney claims that there was insufficient evidence of "sexual contact" because there was no evidence that he touched M.S. or K.O. for purposes of sexual gratification.

{¶ 92} "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). The state was not required to show that Heiney was actually sexually aroused or gratified, but that he touched M.S. and K.O. for that purpose. *State v. Brown*, 3d Dist. Hardin No. 6-12-01, 2012-Ohio-3904, 2012 WL 3679568, ¶ 21. In the absence of direct testimony regarding sexual arousal or gratification, "the trier of fact may infer a purpose of sexual arousal or gratification from the type, nature and circumstances of the contact, along with the personality of the defendant. From these facts, the trier of facts may infer what the defendant's motivation was in making the physical contact with the victim." (Citations omitted.) *State v. S.H.W.,* 2d Dist. Greene No. 2015-CA-25, 2016-Ohio-841, 2016 WL 853694, ¶ 62.

{¶ 93} Heiney argues that such evidence is completely lacking. In support, Heiney argues that all of the touching occurred during medical examinations in which Heiney maintained a "professional demeanor," and that Heiney did not ask M.S. or K.O. to "keep quiet" about anything. Heiney also argues that neither witness observed Heiney display any obvious type of sexual arousal, such as an erection.

{¶ 94} While Heiney's arguments highlight evidence that he touched M.S. and K.O. for legitimate medical purposes, his arguments do not negate the presence of countervailing evidence in the record that, if believed by the jury, established that Heiney touched M.S. and K.O. for his own sexual gratification. For example, Foetisch testified that, as an orthopedic surgeon, he has never found it medically necessary to give a patient a breast exam, place gauze in the bra of a patient who is receiving a shoulder injection, or remove a patient's underwear during an

46

examination. And, as discussed, three separate witnesses—C.G., S.E., and L.G.—offered testimony regarding similar acts by Heiney and their testimony was properly admissible under Evid.R. 404(B) because it was probative of Heiney's actual "intent" when he touched M.S. and K.O. in similar ways—i.e., that his "intent" was for purposes of sexual gratification. *See, e.g.*, *State v. Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, 22 N.E.3d 1112, ¶ 62 (finding "other act" testimony was relevant in action against physician for gross sexual imposition because it tended to disprove that the breast exams were for legitimate medical purposes and, instead, were performed for sexual arousal or gratification.).

{¶ 95} Moreover, evidence that Heiney acted with a nefarious purpose may be inferred from Heiney himself. During his interviews, Heiney asserted that he always wears gloves and asks permission before touching a patient's sensitive areas, there is no reason to perform a chest exam unless a patient complains of pain radiating to or from the chest area, and there is no reason to expose a patient's full buttocks if the patient's complaints are limited to the low back or SI joint. And yet, according to M.S., Heiney pushed and squeezed her entire breast with his bare hand, and did not ask permission before pulling her bra cup away and placing gauze under her exposed breast. And, according to K.O., Heiney did not ask for permission before removing her pants and underwear; Heiney fully exposing her buttocks and vagina; Heiney touched her vagina with bare hands and without any explanation or warning; and Heiney touched her full breast, without gloves, despite the absence of any complaint by her of pain or inflammation there.

{¶ 96} We find, examining the evidence in the light most favorable to the state, that there was sufficient evidence that Heiney's contact with M.S.'s and K.O.'s erogenous areas was for the purpose of sexual arousal or gratification.

**B. "Force or Threat of Force"**

{¶ 97} Heiney also argues insufficient evidence of "force or threat of force." "Force" is expressly defined by the Revised Code as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 98} "Any," as used in R.C. 2901.01(A)(1), is an adjective. "'As an adjective, 'any' is defined as: '[o]ne or some, regardless of kind, quantity, or number; an indeterminate number or amount.'" *State v. Euton*, 3d Dist. Auglaize No. 2-06-35, 2007-Ohio-6704, 2007 WL 4374293, ¶ 60, quoting The American Heritage Dictionary (2nd College Ed.1985) 117. "[T]he insertion of the word 'any' into the definition of 'force,' recognizes that different degrees and manners of force are used in various crimes with various victims." *State v. Lillard*, 8th Dist. Cuyahoga No. 69242, 1996 WL 273781, *6, 1996 Ohio App. LEXIS 2150, *15 (May 23, 1996).

{¶ 99} "Violence" is defined, in part, as "[t]he use of physical force" or "[p]hysical force exerted for the purpose of violating, damaging, or abusing." *State v. Stevens*, 3d Dist. Allen No. 1-14-58, 2016-Ohio-446, 58 N.E.3d 584, ¶ 19, quoting *Black's Law Dictionary* 1801 (14th Ed.2014) and *The American Heritage Dictionary* at 1350.

47

{¶ 100} "Compulsion" means "[t]he act of compelling; the quality, state, or condition of being compelled." *Stevens* at ¶ 19, quoting *Black's* at 348. "Compulsion can take other forms than physical force; but in whatever form it appears* * * [i]t can best be considered under the heads of obedience to orders, material coercion, duress per minas, and necessity." *Id.,* quoting Turner, *Kenny's Outlines of Criminal Law* 54 (16th Ed.1952).

{¶ 101} "Constraint" means "state of being checked, restricted, or compelled to avoid or perform some action." *Merriam Webster's Collegiate Dictionary* 248 (10th Ed.1996).

{¶ 102} Importantly, the plain language of R.C. 2907.05(A)(1) requires a causal connection between the defendant's use of "force or threat of force" and the victim's "submission" to the sexual contact. "Submit" means "a. to yield oneself to the authority or will of another: SURRENDER; b. to permit oneself to be subjected to something." *Merriam Webster's Collegiate Dictionary* 1173 (10th Ed.1996). Accordingly, the essential issue is whether the perpetrator's exertion of *any* amount of "force or threat of force" was sufficient to overcome the will of the victim. *State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, 2012 WL 2371396, ¶ 49, quoting *State v. Eskridge*, 38 Ohio St.3d 56, 58-59, 526 N.E.2d 304 (1988) (stating that R.C. 2907.05(A)(1) requires more than "force necessary to facilitate the act"—i.e., the sexual contact itself—and, instead requires "force or threat of force sufficient to overcome the will of the victim.").

{¶ 103} Heiney argues that R.C. 2907.05 does not criminalize sexual contact based on any special position of trust, such as the doctor-patient relationship, and there was no evidence that he "ever tried to force or restrain [M.S. or K.O.] in any way or even verbalized a threat." In response, the state argues that Heiney is in "a position of authority" as a medical professional and, accordingly, the force may be "subtle and psychological" under the Supreme Court of Ohio's decision *1060 *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988). Heiney claims, however, that *Eskridge* has been limited to cases of parent-child sexual abuse. Finally, the state also argues that, even if *Eskridge* is inapplicable, Heiney's physical manipulation of the victims' clothing was sufficient physical "force."

{¶ 104} In *Eskridge*, a father was accused of raping his four-year-old daughter. When considering the force element of rape, the court recognized that coercion is inherent in the parent-child relationship and stated that "force need not be overt and physically brutal, but can be subtle and psychological." *Id.* at 58-59, 526 N.E.2d 304.

{¶ 105} Four years later, however, the Supreme Court of Ohio issued *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), in which the court considered whether the defendant could be convicted for the forcible rape of his adult daughter, where the *only* alleged "force" was psychological compulsion. The court found that psychological compulsion was insufficient "force," and clarified that *Eskridge* was "based solely on the recognition of the amount of control that parents have over their children, particularly young children." *Id.* at 55, 600 N.E.2d 661. Then, without any analysis of the statutory components of "force" under R.C.

2901.01(A)(1), the court held that "[a] defendant purposefully compels another to submit to sexual conduct by force or threat of force if the defendant uses *physical* force against that person, or creates the belief that *physical* force will be used if the victim does not submit." *Id.* at paragraph one of syllabus (emphasis added).

{¶ 106} A few years after *Schaim*, the Supreme Court of Ohio revisited the issue of "force" in *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998). In *Dye*, the defendant, a 44-year-old non-relative, cared for a 9-year-old boy on a weekly basis in his home. The issue was whether the defendant could be convicted of raping that child "without evidence of express threat of harm or evidence of significant physical restraint." The defendant argued that *Eskridge* was inapplicable due to the absence of a parent-child relationship, but the court disagreed, stating that *Eskridge* was applicable in cases involving children and "an important figure of authority." *Id.* at 767, quoting *Eskridge* at 59, 526 N.E.2d 304. The court noted that although defendant was not the victim's parent, he "stood in a position of authority over him" and "the evidence of psychological force is substantial." *Id.* The court also "recognize[d] that it is nearly impossible to imagine the rape of a child without force involved." *Id.* at 766.

{¶ 107} Our review of Ohio case law indicates that, following the subsequent decisions of *Schaim* and *Dye*, the recognition of the legal sufficiency of mere "subtle and psychological" force under *Eskridge*—which is, by its very nature, neither *physical* force nor threat of *physical* force, as required under *Schaim*—has been limited to cases of rape or gross sexual imposition involving a defendant with some type of parental or similar authority over a child, or situations involving closely-analogous relationships of disparate power between the defendant and victim. *See, e.g.*, *State v. Fortson*, 8th Dist. Cuyahoga Delaware No. 92337, 2010-Ohio-2337, 2010 WL 2106010, ¶ 86 (extending "the *Eskridge* rule" regarding "subtle and psychological" force to abuse by a correctional officer against female inmates); *State v. Oddi*, 5th Dist. No. 02CAA01005, 2002-Ohio-5926, 2002 WL 31417665, ¶ 57 (extending *Eskridge* to sustain GSI conviction against drivers education instructor who, "[a]lthough not a parent, or in loco parentis, appellant was certainly in a position of authority" over "a child of fifteen-and-a-half.").

{¶ 108} But, separate and apart from the Supreme Court of Ohio's recognition of the sufficiency of mere "subtle and psychological" force in *Eskridge*, the court also stated in that same opinion that "[a]s long as it can be shown that the * * * victim's will was overcome by fear or duress, the forcible element of rape can be established." *Eskridge*, 38 Ohio St.3d at 58, 526 N.E.2d 304. "[T]he Court's statement regarding overcoming the victim's will was not specified to apply only to position of authority over children cases. It was set forth as general law." *State v. Rupp,* 7th Dist. Mahoning No. 05MA166, 2007-Ohio-1561, 2007 WL 969069, ¶ 28; *Accord, State v. Wine,* 3d Dist. Auglaize No. 2-12-01, 2012-Ohio-2837, 2012 WL 2371396, ¶ 40. Indeed, whether "the victim's will was overcome by fear or duress" was the key inquiry in three analogous cases involving allegations of sexual misconduct by medical providers: *State v. Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, 2004 WL 2600461, ¶ 12; *State v. Dew*, 7th Dist.

Mahoning No. 08 MA 62, 2009-Ohio-6537, 2009 WL 4756342, ¶ 109; and *State v. Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, 22 N.E.3d 1112, ¶ 36.

{¶ 109} In *Pordash*, the Ninth District reviewed the case of a chiropractor convicted on three counts of forcible rape against three different women. In each instance, the defendant-chiropractor inserted his finger into the female patient's vagina during a treatment session and while the patient was laying on the examination table. The court stated that although "the doctor-patient relationship does not create an inference of force, that is not to say that it is entirely irrelevant. The relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Pordash* at ¶ 12, citing *Eskridge* at 58, 526 N.E.2d 304. "As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." *Id.*, quoting *Eskridge* at 59, 526 N.E.2d 304. The *Pordash* court found sufficient evidence of force because each victim testified that they experienced "intense fear" during these encounters because "each victim knew of Appellant's extensive background in martial arts" and "feared that any resistance would lead to serious bodily harm." *Id.* at ¶ 12.

{¶ 110} In *Dew*, the Seventh District considered a defendant-chiropractor who was convicted, among other things, of GSI against "Patient B" and forcible rape against "Patient C." The court found insufficient evidence as to both.

{¶ 111} "Patient B" testified that during a chiropractic treatment session, the defendant pulled down her underwear to massage her bare buttocks, while commenting that she must have worn matching undergarments for his benefit. During a subsequent visit, the defendant strapped Patient B to the examination table by her ankles. Then, while she was face-down, he massaged her and "ran his fingertips along the sides of her bare breasts in a tickling motion. She said she was scared and froze, afraid to move." *Id.* at ¶ 38. The court found that this was insufficient evidence of force because "Patient B never stated she believed Dew would cause her contemporaneous harm if she resisted his touching." *Id.* at ¶ 117. The court found that, unlike the *Pordash* victims, Patient B's subjective fear was not enough because there was no evidence of an implicit "threat of force." That is, "[t]here was no evidence of an attempt to frighten Patient B or to imply that resistance would lead to force." *Id.* at ¶ 119.

{¶ 112} We find that the Seventh District's analysis, however, improperly equates "force" with "violence" *alone*—even though "force" also includes "any" *1062 amount of physically-exerted "compulsion" or "constraint." R.C. 2901.01(A)(1). This seems to have caused the court to ignore evidence of physical "constraint"— i.e., Patient B was physically strapped to the examination table—although it noted elsewhere in its opinion that the strap was "only around her ankles and it would have been easy to slip it on or off." *Id.* at ¶40. But, R.C. 2901.01(A)(1) says "*any* violence, compulsion, or constraint physically exerted by any means" is sufficient to establish force—thus even a minimal "constraint" is sufficient.

{¶ 113} The other patient in *Dew*, "Patient C," alleged that Dew had raped her during a chiropractic exam. Patient C testified that the defendant performed several "internal coccyx adjustments," performed digitally through the rectum, to relieve

50

her tailbone pain. During three of these adjustments, the defendant inserted his finger in her vagina while she was lying face-down on the examination table. *Id.* at ¶ 31-34. The patient testified that she consented to the vaginal "adjustments" because she trusted him as a doctor. *Id.*

{¶ 114} The *Dew* court noted that "the state did not advance much of an argument about force with regard to the rape of Patient C, other than asserting that the 'force' stems from the fact that Dew exceeded the scope of proper treatment" and it concluded that even though the doctor "may have used fraud or deception to secure Patient C's consent * * * this does not satisfy the force element of rape." *Id.* at ¶ 123. The court found insufficient evidence of force because Patient C "never said she feared Dew, was intimidated by him, or that she believed resistance would lead Dew to cause her harm." *Id.* at ¶ 123. But, as with Patient B, the Seventh District's analysis improperly focused on the "violence" aspect of force while ignoring that force also includes *any* amount of coercion or constraint physically exerted by any means, R.C. 2901.01(A)(1); 2907.05(A)(1), of which there may have been evidence in the record.

{¶ 115} Finally, in *Roy*, the Ninth District addressed alleged improper sexual contact by a defendant physician against three adult women: Annette, Jocelyn, and Jolene.

{¶ 116} Annette and Jocelyn were both potential employees in Roy's medical office. On Annette's first day on the job as a medical assistant in Roy's office, he told her that she would need a physical exam to work there. During the exam, he pulled down her bra and fondled her breasts. *Id.* at ¶ 10-13. Annette testified that he later put an arm around her, and she tried to step away to some degree and that Roy then blocked the doorway. *Id.*

{¶ 117} Jocelyn testified that she came to the defendant's medical office for an after-hours job interview. No one else was present. Roy told her that he would need to give her a physical exam as part of the application. She testified that Roy was standing in front of her as he took her blood pressure, and she could feel that he had an erection "rubbing on her knee." She testified that she did not leave or ask Roy to stop because she was afraid. Later in the medical exam, he unsnapped her bra and groped her breasts while she was laying on the exam table and he was positioned between her and the door. He later asked her to pull her pants down to her knees, which she did, and he rubbed the inside of her legs with his hands. *Id.* at ¶ 16-23.

{¶ 118} The court found sufficient evidence to support the GSI convictions with regard to Annette and Jocelyn because both women were isolated in the closed examination room, where Roy was positioned between them and the door. The court noted that "the relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Id.* at ¶ 35 quoting *Pordash*, 9th Dist. Lorain No. 04CA008480, 2004-Ohio-6081, 2004 WL 2600461, at ¶ 12. The court noted that Roy was a potential employer for both women, and "was in the position to either help or hinder them in their pursuit of their professional goals" and that he touched the women "in his capacity as a practicing physician, a position

51

of trust." *Id.* The court found that there was sufficient evident that Roy employed "either compulsion or constraint to compel Annette and Jocelyn to submit" to the sexual contact.

{¶ 119} The third adult victim, Jolene, regularly visited Roy's family practice as a patient. On one instance, she said that while Dr. Roy listened to her heart, he set down his stethoscope and reached under her shirt and bra and fondled her breasts. "She stated she remained silent because she was scared and did not want to accuse a doctor of touching her inappropriately if she was misinterpreting the situation." *Id.* at ¶ 30. Jolene went back to Roy for another appointment, and he again squeezed her breasts in the same manner as before. Both times, Roy "did not tell her that he was going to touch her breasts or explain why it would be necessary for him to do so." *Id.* at ¶ 31.

{¶ 120} The *Roy* court found insufficient "force" to sustain the GSI conviction relating to Jolene because "[a]lthough she testified that Roy made her uncomfortable, she did not testify that she tried to pull away from him or vocalized her discomfort during the exams." *Id.* at ¶ 40. The court also stated that it felt constrained by the fact that R.C. 2907.05 does not explicitly "criminalize sexual contact based on any special position of trust that the offender may occupy," such as a physician. *Id.* at ¶ 44. We find several problems with this analysis.

{¶ 121} First, in order to prove force, "a victim need not prove physical resistance to the offender." R.C. 2907.05(D). Nor is a victim required to "vocalize" their fear or duress. Whether a victim physically resists or vocalizes any fear is merely *probative* of force, but not *required* for a finding of force. *See, e.g.*, *State v. Stevens*, 3d Dist. No. 1-14-58, 2016-Ohio-446, 58 N.E.3d 584, ¶ 25, quoting *State v. Henry*, 3d Dist. Seneca No. 13-08-10, 2009-Ohio-3535, 2009 WL 2159688 (Shaw, J., dissenting) (stating that the victim's resistance can be used "to infer any force or threat of force on the part of the defendant" and "the degree of force necessary for [the victim] to get away from [the defendant] is further indication of the degree of force being used by [the defendant] to perpetrate the offense.").

{¶ 122} Second, although we agree that the doctor-patient relationship does not create an inference of force, there is no question that "[t]he relationship of the parties is a relevant fact when examining whether the element of force has been proven." *Roy.* at ¶ 35. Thus, the doctor-patient relationship is still a relevant factor to determine whether *any* amount of violence, compulsion, or constraint (or threat thereof) was sufficient to cause the victim "to submit" to sexual contact. And given the unique nature of the doctor-patient relationship, it is likely that a victim-patient will "submit" to sexual contact during a medical examination upon even the slightest amount of physical force, even though the same amount of force would be insufficient to cause a victim to submit within the context of a different relationship. "While an inappropriate touch would be cause for alarm if performed by an ordinary member of society, few would question the same touch if it occurred during a doctor's examination." *Id.* at ¶ 45. The law is clear: *any* amount of physical force or threat of physical force, however slight, is sufficient to support a GSI conviction, and "force is a relative term, which depends on the totality of the

circumstances in a given case." *Rupp,* 7th Dist. Mahoning No. 05MA166, 2007-Ohio-1561, 2007 WL 969069 at ¶ 49. We now turn to the two alleged victims in this case: M.S. and K.O.

{¶ 123} The state alleged that Heiney committed GSI against M.S. during her final appointment on February 12, 2015. M.S. alleged that Heiney fondled her breasts three times. First, he asked M.S. for permission to perform a "breast exam," ostensibly to see if the pain in her arm was somehow radiating from her breast, where she felt no pain. She agreed. Heiney then pulled the cup of her bra down, which completely exposed her breast, and he pushed and squeezed her breast with his bare hand. He later asked for her permission to examine her breast again, and then he "pushed on [her breast] a couple times." Finally, before giving M.S. an injection in her arm, Heiney pulled the cup of her bra away from her body, and placed a piece of gauze "deep inside [M.S.'s] bra under [her] breast" with his bare hand. No one was in the examination room at the time. Heiney was standing between M.S. and the door. M.S. testified that although she did not vocalize her distress or physically resist, Heiney's conduct made her feel "uncomfortable" and "embarrassed * * * angry [and] ashamed."

{¶ 124} We find that Heiney's repeated manipulation and movement of M.S.'s bra, while examining her in closed room without anyone else present, and while standing between M.S. and the door, is sufficient evidence of a physical "compulsion" or "constraint" that was separate and apart from the sexual contact itself. "Courts have found the element of force satisfied when the state presented evidence that the defendant manipulated or moved the victim's body or clothing* * *" *State v. Fouts*, 4th Dist. Washington No. 15CA25, 2016-Ohio-1104, 2016 WL 1071457, ¶ 78 (Citing cases). The facts relating to M.S. are most analogous to patient "Annette" in *Roy*, where Roy pulled down Annette's bra, in a closed exam room, and fondled her breasts. *Roy,* 9th Dist. Lorain No. 13CA010404, 2014-Ohio-5186, 22 N.E.3d 1112, at ¶ 10-13. Annette also similarly testified that "she never told Roy she was uncomfortable during the exam because he was a doctor and doctors are supposed to be trustworthy." *Id.* at ¶ 11. Moreover, this case is unlike "Patient C" in *Dew*, where the court noted that the use of fraud or deception to secure Patient C's consent to the unnecessary "vaginal adjustment" was, *by itself*, insufficient of force. *Dew*, 7th Dist. Mahoning No. 08 MA 62, 2009-Ohio-6537, 2009 WL 4756342, ¶ 124. There, unlike here, the state merely argued that Dew exceeded the scope of consent; it did not advance a theory of *physical* force that was separate from the sexual conduct itself. *Id.* at ¶ 123. And, even if we assume that M.S.'s additional verbal consent to the two "breast exams" is somehow relevant to the analysis, Heiney did not ask for permission before he pulled her bra away and pushed a piece of gauze under her breast.

{¶ 125} Turning to K.O., during the examination in the closed room, Heiney directed her to take her arm out of her sleeve and bra strap. Heiney then held K.O.'s left arm with one of his hands and with his other hand, he pulled down her bra, exposed her breast and gave her a "breast exam." Later, while examining her low back, K.O. testified that Heiney "grabbed my pants and my underwear and pulled

53

them down to right above my knees, and then started to feel around on my side and in my upper thigh region where his fingers kind of brushed against my private area."

{¶ 126} Similar to M.S., we find that any rational trier of fact could have found that Heiney exercised some physical "compulsion" or "constraint" over K.O. by manipulating and removing articles of clothing—her bra, pants, and underwear—while in a closed room with no one else present. This physical manipulation of clothing required force, however minimal, beyond that inherent in the act of the sexual contact itself. Moreover, this minimal physical force was sufficient given the totality of the circumstances, including the nature of the parties' doctor-patient relationship.

{¶ 127} We therefore find Heiney's first assignment of error ("Error I") not well-taken.

*State v. Heiney*, 117 N.E.3d at 1057–65.

In arguing it was "objectively unreasonable" for the state court of appeals to find that a rational trier of fact could have found Petitioner guilty beyond a reasonable doubt on the two counts of gross sexual imposition, Petitioner focuses his argument on the findings of "force" and "sexual gratification" necessary for those convictions.  (ECF Doc. 22, pp. 42-67.)  As to force, he focuses his argument on Ohio state court decisions defining and applying "force" in other cases, without clearly explaining how the state court of appeals' own interpretation of that same caselaw amounted to a violation of his due process rights under the U.S. Constitution.  (*Id.* at pp. 43-57.)  As to sexual gratification, Petitioner argues that his due process rights were violated because any inference that he acted for his own sexual gratification was "based solely upon the genders of the doctor and the patients," without regard for the fact that the acts alleged were not "outside of the duties of a physician."  (*Id.* at p. 57.)  Other than noting the *In re Winship* requirement that every element be proven beyond a reasonable doubt, Petitioner's arguments again focus on the governing decisions of Ohio state courts.  (*Id.* at pp. 57-67.)

Respondent first observes that any claim of error in the interpretation of the word "force" in a state criminal statute is not cognizable in federal habeas corpus, as this court is bound by the state court's interpretation of state law in the underlying decision of the state court of appeals.

54

(ECF Doc. 35, pp. 22-23.)  Respondent is correct that this Court is bound by the state court of appeals' interpretations of state law governing the definitions of both "force" and "sexual gratification" as used in Ohio's criminal statutes.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." (citations omitted)); *Haight v. Jordan*, 59 F.4th 817, 854 (6th Cir. 2023) (quoting *Bradshaw*).

    "Force"

    As to the term "force," the state court of appeals considered the statutory definition—which included "compulsion[] or constraint physically exerted by any means"—and the requirement of a causal connection between the use of force and the victim's submission to sexual contact.  *Heiney*, 117 N.E.3d at 1059.  The court acknowledged that "subtle and psychological" force would be insufficient to satisfy state law in this case, but that it *would* be sufficient for the state to show that "the victim's will was overcome by fear or duress."  *Id.* at 1060-61.  The court also acknowledged that "the doctor-patient relationship does not create an inference of force," but found that relationship was relevant "to determine whether *any* amount of violence, compulsion, or constraint (or threat thereof) was sufficient to cause the victim 'to submit' to sexual contact."  *Id.* at 1063 (emphasis in original).  Indeed, the court observed "given the unique nature of the doctor-patient relationship, it is likely that a victim-patient will 'submit' to sexual contact during a medical examination upon even the slightest amount of physical force, even though the same amount of force would be insufficient to cause a victim to submit within the context of a different relationship."  *Id.*  The state court of appeals' interpretation and application of the term "force" is binding on this Court.  *See Bradshaw*, 546 U.S. at 76.

55

In this context, the state court of appeals found with respect to the victim M.S. that Petitioner's "repeated manipulation of M.S.'s bra, while examining her in a closed room without anyone else present, and while standing between M.S. and the door" to be sufficient evidence of physical compulsion or constraint separate from the sexual contact itself to constitute force. *Id.* at 1064.  Likewise, the court found with respect to victim K.O. that a rational trier of fact could have found that Petitioner exercised physical compulsion or constraint over K.O. "by manipulating and removing articles of clothing—her bra, pants, and underwear—while in a closed room with no one else present." *Id.* at 165.  The court observed that "minimal physical force was sufficient given the totality of the circumstances, including the nature of the parties' doctor-patient relationship." *Id.*

"Sexual gratification"

As to sexual gratification, the state court of appeals observed that the element of "sexual contact" required the touching of an erogenous zone of another "for the purpose of sexually arousing or gratifying either person." *Heiney*, 117 N.E.3d at 1058.  The court observed that the state need not show that Petitioner "was actually sexually aroused or gratified, but that he touched M.S. and K.O. for that purpose," and that the trier of fact could infer that purpose from "the type, nature and circumstances of the contact." *Id.*  The court also noted that three witnesses offered testimony regarding similar acts that was admissible under Ohio rules of evidence "because it was probative of Heiney's actual 'intent' when he touched M.S. and K.O. in similar ways—i.e., that his 'intent' was for purposes of sexual gratification." *Id.*  The state court of appeals' interpretation regarding "sexual contact" and the evidentiary rules governing evidence of similar acts is binding on this Court. *See Bradshaw*, 546 U.S. at 76.

In this context, the state court of appeals found sufficient evidence that Petitioner's contact with the victims' erogenous areas was for purposes of sexual arousal or gratification in light of: testimony from orthopedic surgeon Dr. Foetisch that he had never found certain of Petitioner's reported actions—giving breast exams, placing gauze inside a bra before a shoulder injection, or removing a patient's underwear during an examination—medically necessary; testimony from three witnesses to similar acts by Petitioner; and Petitioner's own statements to police regarding his own practices—that he always wears gloves, asks permission before touching sensitive areas, does not perform a chest examination unless a patient complains of chest pain, and that there is no reason to expose a patient's full buttocks if complaints are limited to the low back or SI joint. *Id.* at 1058-59. Noting the variance between Petitioner's self-reported practices and the actions described by the victims, the court found sufficient evidence the Petitioner's actions were for the purpose of sexual arousal or gratification. *Id.* at 1059.

The undersigned finds that the above determinations by the court of appeals were neither objectively unreasonable applications of clearly established federal law nor unreasonable determinations of the facts in light of the evidence presented in the state court proceeding. *See Lockyer*, 538 U.S. at 75; *Burt*, 571 U.S. at 18. Under the second layer of deference for federal habeas review of sufficiency claims, the undersigned further finds the state court determinations were not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby*, 565 U.S. at 24.

### 4. Altering Medical Records

In challenging the sufficiency of the evidence as to the tampering with records charge, Petitioner asserts he was denied due process of law because "no evidence was submitted to establish an altering of medical records." (ECF Doc. 17, pp. 1-2.) He explains in his Traverse

that "no evidence was submitted to establish an altering of medical records . . . as there was no

'alteration' of a record, as all records remained intact."  (ECF Doc. 22, p. 42.)  He further argues

there was no evidence offered that he "acted with the required purpose to defraud."  (*Id.* at p. 67.)

### i.  Evidence Was Sufficient Under *Jackson* Standard

As with the prior analysis, Petitioner acknowledges the two levels of deference in the

applicable standard, but limits his argument to the second level of deference—whether "the state

court was 'objectively unreasonable' in concluding that a rational trier of fact could find

[petitioner] guilty beyond a reasonable doubt."  *Stewart*, 595 F.3d at 653.  (ECF Doc. 22, p. 43.)

Because Petitioner focuses his argument on the second level of deference, the undersigned will

proceed to that analysis.

### ii.  State Court of Appeals' Sufficiency Determination Was Reasonable

The state court of appeals addressed Petitioner's sufficiency claim as to his conviction for

altering medical records as follows:

> {¶ 39} Whether the evidence is legally sufficient to sustain a verdict is a question
> of law. *Thompkins* at 386, 678 N.E.2d 541. In determining whether a conviction is
> based on sufficient evidence, an appellate court does not assess whether the
> evidence is to be believed, but whether, if believed, the evidence against a
> defendant would support a conviction. *See Jenks* at paragraph two of the syllabus;
> *Yarbrough* at ¶ 79 (noting that courts do not evaluate witness credibility when
> reviewing a sufficiency of the evidence claim).

> {¶ 40} Heiney's tampering-with-records conviction was based on edits that he
> made to K.O.'s electronic medical record ("E.M.R.") An E.M.R. is generated after
> a doctor dictates patient notes into a recording device. The dictation is sent to an
> outside medical transcriptionist who types the record into a Microsoft Word
> document and sends the Word document to the medical office. At that point, one
> of Heiney's assistants would "copy and paste" the E.M.R. into the patient's chart.
> Occasionally, an E.M.R. would need to be amended, and such amendment is called
> an "add-on." Whenever an E.M.R. is modified or edited with an "add on," the
> original version still remains in the system but is stored on a different server. An
> audit log tracks when E.M.R.'s are modified, printed, or opened for viewing.

> {¶ 41} The E.M.R. that K.O. requested and received from Heiney's office (which
> she later gave to the police) differed from the one that Heiney produced to the police

in response to their subpoena. The latter version includes additional details and descriptions, which the state alleges were added by Heiney after his police interview "in an attempt to provide a medical rationale for his groping of [K.O.'s] breasts and buttocks." Both records were shown to the jury, and the relevant portions of each record are shown below. The original E.M.R. is on the left; the modified version is on the right:

| Original Progress Note Provided to K.O. | Modified Progress Note Produced Pursuant to Subpoena |
|---|---|
| **History:** * * * <br><br> [No reference] | **History:** * * * Sometimes radiates to chest.  The low back, buttock & hip pain has been going on for years. |
| **Physical Exam**: * * * *Musculoskeletal*: * * * <br><br> [No reference] | **Physical Exam:** * * * *Musculoskeletal:*  * * * No reproducible pain or discharge in chest * * * Tight hamstrings, pain to palpation at both SI joints.  No spinal step-off bogginess. * * * |
| *Plan*: * * * <br><br> [No reference] | *Plan:*  * * * We will work up back, buttock & hip pain further at that time with radiography. |

{¶ 42} Heiney admits that K.O.'s E.M.R. was changed under his direction. Indeed, the audit log confirms that on May 6, 2015—within hours of his police interview—Heiney viewed and printed the E.M.R. Then, the next day, Heiney gave his assistant, Jennifer Downard, some handwritten notes on the printed E.M.R. and asked Downard to make an "add-on." Downard testified that this was how Heiney normally made "add-ons" to a patient's E.M.R., and that Heiney did not ask her to refrain from telling anyone about the changes. Heiney stated that he asked Downard to make the changes "to make sure [the E.M.R.] was as correct as it could be." Heiney produced the modified E.M.R. in response to subpoena; he did not produce a copy of the original E.M.R.

{¶ 43} R.C. 2913.42(A)(1), the "tampering with records" statute, provides, in part, that "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following: * * * Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record." Heiney argues that there was insufficient evidence to support his conviction for tampering with records because (1) he was privileged to alter his own medical records; (2) the "minor changes" did not contain any false information; and (3) there is no evidence that he acted with purpose to defraud.

{¶ 44} First, Heiney argues that because he owned the medical records, he was privileged to make changes to them. Heiney is incorrect. The statute precludes tampering with both private and public records. *See* R.C. 2913.42(B)(4); *see also*

59

1974 Committee Comment to R.C. 2913.42 (noting that the statute "prohibits tampering with all private as well as public records, for fraudulent purposes, and thus expands upon former law which prohibited such conduct only with respect with public documents.").

{¶ 45} Heiney also argues that he could not be convicted of violating R.C. 2913.42(A)(1) because "the tampering must involve fraudulent information." Heiney is, again, incorrect. The statute prohibits more than just the falsification of records. It also criminalizes destroying, removing, concealing, altering, defacing, or mutilating records. The evidence sufficiently established that Heiney altered the E.M.R.

{¶ 46} Finally, Heiney argues that the "minor additions * * * accurately listed the same symptoms to which [K.O.] testified about," and points to K.O.'s statement to police in which she states that her symptoms included some pain in the buttocks. In essence, Heiney argues that there was no evidence that he altered the E.M.R. "with purpose to defraud." The state responds that Heiney altered K.O.'s E.M.R. to provide a "medical rationale for his groping of [K.O.'s] breasts and buttocks."

{¶ 47} R.C. 2913.01(B) defines "defraud" as "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." Pursuant to R.C. 2901.22(A), purpose requires "an intention to cause a certain result or to engage in conduct that will cause that result." Purpose or intent can be established by circumstantial evidence from the surrounding facts and circumstances in the case. *See Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492.

{¶ 48} In a similar case, a physician was under investigation for committing Medicaid fraud. *State v. Urban,* 10th Dist. Franklin No. 01AP-239, 2002 WL 464980, 2002 Ohio App. LEXIS 1421 (Mar. 28, 2002). After receiving subpoenas of his medical files, he inserted additional details into progress notes. The doctor was then indicted for fraud and tampering with evidence, in violation R.C. 2921.12(A).[2] On appeal, the Tenth Appellate District found that there was legally sufficient evidence to convict him of tampering. The court held,

A forensic expert testified that the charts had been altered in Dr. Urban's handwriting. Indeed, Dr. Urban does not deny that he added new material to patient charts after they were subpoenaed. Rather, he stated that he did not know it was wrong and that his actions did not actually hamper the investigation.

We acknowledge that there was trial testimony that Dr. Urban wrote openly in the charts, in plain view of anyone who would walk by, and that, when asked about it, he explained that his lawyer told him he was allowed to do it. However, the fact that exculpatory evidence was presented does not mean that the jury was required to believe it. The jury could rely on the following evidence of tampering, including the sequence of events. * * * Then there was evidence that patient charts were subpoenaed, after which Dr. Urban personally reviewed the files and altered most of them. Charts showed additions of a type that could be viewed as an attempt to

justify testing and billing. The jury could reasonably find that Dr. Urban altered the documents by adding to them. The jury could reasonably infer a motive to deceive and could find defendant guilty beyond a reasonable doubt of tampering with the evidence.

{¶ 49} The evidence is strikingly similar in the case before us. Given that Heiney altered the E.M.R. shortly after his police interview, we find that the jury could reasonably conclude that Heiney's purpose in doing so was to defraud—i.e., to deceitfully legitimize an otherwise unnecessary and improper touching of a patient's erogenous zone.

{¶ 50} Heiney's fourth assignment of error is not well-taken.

*State v. Heiney*, 2018-Ohio-3408, ¶¶ 39-50, 117 N.E.3d 1034, 1048–51.

As with his arguments regarding his other criminal charges, Petitioner focuses his arguments on the interpretation of a state criminal statute under state law.  (ECF Doc. 22, pp. 67-81.)  As discussed above, this Court is bound by the state court of appeals' interpretations of state law governing the application of Ohio's criminal statutes.  *Bradshaw*, 546 U.S. at 76; *Haight v. Jordan*, 59 F.4th 817, 854.

Here, the state court of appeals observed that the applicable statute "criminalizes destroying, removing, concealing, *altering*, defacing, or mutilating records," and that Petitioner altered records in this case.  *Heiney*, 117 N.E.3d at 1050 (emphasis added).  As to the statutory requirement of a "purpose to defraud," the court observed that "defraud" includes "knowingly obtain[ing], by deception, some benefit to oneself" and that "purpose" can be shown by circumstantial evidence from the surrounding facts and circumstances of the case.  *Id.*  Based on its review of applicable caselaw, the court found the jury could reasonably find that Petitioner had a purpose to defraud when he altered an electronic medical record (E.M.R.) "shortly after his police interview" with a purpose of "deceitfully legitimiz[ing] an otherwise unnecessary and improper touching of a patient's erogenous zone."  *Id.* at 1051.

Petitioner's argument that "date-stamped additions to an electronic database" cannot be construed as "alterations" under the state criminal statute (ECF Doc. 22, pp. 73-74) is contrary to the state court's binding legal determination, *Heiney*, 117 N.E.3d at 1050.  As to the "add-on" information Petitioner now argues did not "alter" the relevant medical record, the state court of appeals noted that the addition caused the original E.M.R. to be moved to a different server and resulted in the production of the modified E.M.R. alone in response to a subpoena.  *Id.* at 1049.

The undersigned finds that the above determination by the court of appeals was neither an objectively unreasonable application of clearly established federal law nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See Lockyer*, 538 U.S. at 75; *Burt*, 571 U.S. at 18.  Under the second layer of deference for federal habeas review of sufficiency claims, the undersigned further finds the state court determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Bobby*, 565 U.S. at 24.

For the reasons set forth above, the undersigned finds under the deferential standard of review for federal habeas cases that the state court of appeals' determination was not contrary to or an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of facts in light of the evidence presented in state court. Accordingly, the undersigned recommends that the Court **DENY** Ground One on the merits.

## IV.    Recommendation

For the reasons stated above, the undersigned **ADMITS** two deposition transcripts (ECF Doc. 22-9; ECF Doc. 22-34, pp. 191-304) into evidence for the limited purpose of informing the procedural default analysis for Ground Three of the Petition.

The undersigned additionally recommends that the Court **DENY** Ground One with prejudice, **DISMISS** and/or **DENY** Ground Two with prejudice, **DISMISS** Ground Three based on procedural default, and **DISMISS** Ground Four as noncognizable.

Dated: January 5, 2024

/s/ Amanda M. Knapp
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).